Luis Alberto SOTELO-AQUIJE,
Petitioner-Appellant,

v.

William S. SLATTERY, District Director of the New York District of the Immigration & Naturalization Service and Roseanne Sonchik, Acting Assistant District Director for Detention and Deportation of the New York District of the Immigration & Naturalization Service, Respondents-Appellees.

No. 885, Docket 93-2583.

United States Court of Appeals,
Second Circuit.

Argued Nov. 16, 1993.

Decided Feb. 16, 1994.

Anne Pilsbury, Brooklyn, New York (Lisa Reiner, Central American Legal Assistance, Brooklyn, New York, of counsel) for Appellant.

F. James Loprest, Jr., Special Assistant United States Attorney, New York City, (Mary Jo White, United States Attorney for the Southern District of New York, New York City, and Gabriel W. Gorenstein, Assistant United States Attorney for the Southern District of New York, New York City, of counsel), for Appellees.

Before: MINER, MAHONEY and HEANEY,* Circuit Judges.

HEANEY, Senior Circuit Judge:

Luis Alberto Sotelo–Aquije seeks review of a decision by the Board of Immigration Appeals (BIA) denying his application for asylum and withholding of deportation. We find the BIA's conclusion that petitioner does not have a well-founded fear of persecution on account of his political opinion is not supported by the record or by the BIA's own findings. We reverse the denial of asylum and remand for further proceedings.

## I.

Sotelo fled Peru in November 1992 and arrived at a New York airport with a false passport and no visa. He was taken to a detention center, where he remains today. The government commenced exclusion proceedings against Sotelo, which he defended by filing an application for political asylum and/or withholding of deportation. *See* 8 U.S.C. §§ 1158(a), 1226, 1253(h). In February 1993 a hearing was held before an immigration judge, after which the judge rendered an oral decision denying Sotelo's application. Sotelo appealed to the BIA, which in August upheld the judge's decision. Sotelo sought review of the BIA's decision by filing a petition for a writ of habeas corpus. *See*

---

* The Honorable Gerald W. Heaney, United States Senior Circuit Judge for the Eighth Circuit, sitting by designation.

*id.* § 1105a(b). A stay of deportation was granted pending the outcome of the habeas proceedings. In September 1993 the district court denied Sotelo's habeas petition, having found that the BIA's determinations were supported by substantial evidence.

## II.

■ An alien may be granted asylum in the discretion of the Attorney General, § 1158(a), if she determines that the alien is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A). Fear of persecution is well-founded if a reasonable person in the same circumstances would have such a fear. *Carranza–Hernandez v. INS,* 12 F.3d 4, 7 (2d Cir.1993) (citing *Gomez v. INS,* 947 F.2d 660, 663 (2d Cir.1991)).

■ We review de novo the district court's denial of Sotelo's habeas petition, as we are in the same position as the district court to evaluate the evidentiary findings and legal conclusions of the BIA. *See Dhine v. Slattery,* 3 F.3d 613, 617 (2d Cir.1993). The BIA's factual findings concerning eligibility for asylum and withholding of deportation must be upheld if supported by substantial evidence. *Sofyan Ali Saleh v. INS,* 962 F.2d 234, 238 (2d Cir.1992). To reverse the BIA's determination, the evidence must compel the conclusion that Sotelo had a well-founded fear of persecution on account of his political opinions. *See INS v. Elias–Zacarias,* —— U.S. ——, —— n. 1, 112 S.Ct. 812, 815 n. 1, 117 L.Ed.2d 38 (1992).

■ The BIA found that Sotelo feared persecution from the Shining Path guerrilla organization but concluded that the organization targeted him not on account of his political opinion but because of his position in CUAVES,[1] a municipal governing body. The BIA also concluded, however, that Sotelo failed to demonstrate that the Shining Path targeted individuals for persecution based solely on their membership in CUAVES, so that Sotelo could not show persecution on

account of membership in a particular social group. The BIA denied his application for asylum for failure to satisfy any of the statutory grounds. We agree that the record here does not support the conclusion that CUAVES membership by itself leads to persecution by the Shining Path. We find, however, that the BIA's conclusion that Sotelo was not targeted because of his political acts and opinions is not supported by the record and indeed is contradicted by the BIA's own findings, and we therefore reverse its denial of asylum.

Sotelo's asylum claim arises out of his activities in Villa El Salvador, a town near the capital city of Lima, Peru. Sotelo lived in Villa El Salvador with his wife and three children. Since 1983 he has been a member of the CUAVES governing body, which consists of about a thousand elected community leaders. Villa El Salvador has been recognized nationally and internationally for its progressive economic and political development, which has been carried out through the CUAVES organization. In addition to his unpaid position in CUAVES, Sotelo was employed as a welder mechanic.

Sotelo bases his fear of persecution on threats he received from the Shining Path, or Sendero Luminoso. The Shining Path is a highly organized guerrilla organization with a Maoist communist ideology dedicated to the violent overthrow of Peru's democratic government and social structure. The organization has a history of violence in Peru, including assassinations of political and community leaders, candidates for government office, and opponents of its goals or methods. Sotelo openly opposed the Shining Path and spoke out against the group at CUAVES meetings. Although the town was generally hostile to the Shining Path, Sotelo believed that some CUAVES leaders were affiliated with the organization.

In 1990 Sotelo received his first written threat at his house. The paper carried the hammer and sickle logo of the Shining Path and told him to resign from CUAVES because he was an obstacle to the Shining Path's goals. Sotelo did not pay much atten-

---

1. CUAVES is an acronym for Ciudad Urbana Autogestionaria de Villa El Salvador.

tion to the first threat because other CUAVES members also received them and, to his knowledge, no CUAVES members had yet been killed by the Shining Path. Sotelo received a second similar written threat at his home six months later, but he did not see who brought it. He and other CUAVES members discussed the threats they had received at CUAVES meetings. Sotelo continued his activities but was worried because by this time several attempts had been made on the lives of CUAVES members.

In February 1992 the vice-mayor of Villa El Salvador, Maria Elena Moyano, was murdered by the Shining Path, which also blew up her tomb with dynamite a year later. Sotelo had worked with Moyano in organizing anti-Shining Path marches. Sotelo participated in six marches occurring both before and after Moyano's murder. About a month after Moyano's murder Sotelo received a third written threat at his home. His wife threw away the document but conveyed its contents to Sotelo. It said that the Shining Path had sentenced him as an obstacle, warned him to leave his position in CUAVES, and threatened to kill him if he did not. Sotelo became seriously concerned about the safety of himself and his family. By the time Sotelo received the third threat, about thirty CUAVES members had been killed. Sotelo did not personally contact the police about the threats but reported them to CUAVES. A CUAVES commission contacted the police, who said they did not have the resources to protect him.

Around September 1992 Sotelo and his family went into hiding at the home of a fellow CUAVES leader because the Shining Path had been carrying out its death threats. A month later a fourth written threat was delivered to Sotelo's home. Neighbors who knew the family was in hiding retrieved the document, which contained the same mes-

sage as the third threat. They were alerted to the fourth threat because the outside of Sotelo's house had been painted with the symbol of the Shining Path and with the message that Sotelo had been sentenced to death. The neighbors communicated the threat to Sotelo.

Sotelo's family told him that his father had also received a threat at his house twenty kilometers from Villa El Salvador. His father, who has a retail sales business, did not keep the document, and Sotelo does not know the exact nature of the threat. He believes it was an attempt by the Shining Path to pressure him. His sister Olga, a CUAVES member who works with the Catholic church, has never spoken out against the Shining Path and has not been threatened by them.

Sotelo remained in hiding until he obtained a false passport with the assistance of CUAVES members. He fled Peru in November 1992, leaving behind his wife and children.

The BIA found Sotelo's testimony "believable, consistent, and coherent." *In re Sotelo,* No. A72 468 261, slip op. at 12 (BIA Aug. 6, 1993). It "agree[d] with the applicant that there was no issue below regarding his credibility and that his claim was substantially supported by general documentary evidence." *Id.* at 11.[2] It also specifically found that Sotelo openly opposed the Shining Path: "We initially state that we find that the applicant's work as an elected sector leader of CUAVES in Villa El Salvador and his open opposition to the Shining Path were political acts and expressions of political opinion." *Id.* at 10. The BIA nonetheless concluded that

> [t]he harm the applicant fears is a product of his position as a community leader and a form of harm always present where a violent organization like the Shining Path ex-

---

**2.** Notwithstanding these findings, the BIA suggested that Sotelo could and should have provided additional corroborative evidence of the Shining Path's threats against him. We simply note here that corroboration is not required under INS rules, and in any event Sotelo provided ample background evidence to support the reasonableness of his fear of persecution. *See* 8 C.F.R. §§ 208.13(a), 208.16(b) ("The testimony of the applicant, if credible in light of general con-

ditions in the applicant's country of nationality or last habitual residence, may be sufficient to sustain the burden of proof without corroboration."); *see also Aguilera–Cota v. INS,* 914 F.2d 1375, 1380 (1990) (irrelevant that applicant no longer possessed threatening note); *Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1985) ("Authentic refugees rarely are able to offer direct corroboration of specific threats.").

ists in a country. The dangers community leaders like the applicant face in Peru arise from the nature of their position and not on account of their personal characteristics or political beliefs.

*Id.*

The BIA contradicted itself when it stated that

> other community leaders have remained safe in Villa El Salvador although they have either resigned from their position or been reserved towards the Shining Path. The applicant's own sister, who is a CUAVES community leader and works with the Catholic Church that opposes the Shining Path, has had no problems with the Shining Path due to her reserve[d]ness towards the organization.

*Id.* It concluded that "[t]he record establishes that the Shining Path victim[s] are generally targeted based on their activities or vocalism that opposed the organization or its goals." *Id.* at 11. In its own words, based on testimony and information in the record, the BIA acknowledged that Sotelo spoke out against the Shining Path and that only those CUAVES members who actively opposed the guerrilla group became targets of its violence. These findings and the record before us compel the conclusion that Sotelo had a well-founded fear of persecution on account of his acts and expressions of political opposition to the Shining Path.

■ We also wish to address two other points raised by the BIA's decision. First, the fact that Sotelo had not yet been physically harmed or had a face-to-face confrontation with the Shining Path is not determinative of whether he has a well-founded fear of persecution. *See Turcios v. INS*, 821 F.2d 1396, 1402 (9th Cir.1987) (applicant's "freedom was threatened when he was watched continuously and felt compelled to restrict his activities"). The statute protects not only persons who experienced persecution in the past but also those who reasonably *fear* per-

secution if returned to their country of origin. 8 U.S.C. § 1101(a)(42). The BIA stated it was "not suggesting that the applicant [should] have remained in Peru until a specific act of violence had been directed towards him or his family," yet other statements in its decision left the impression that a personal confrontation was required. *In re Sotelo*, slip op. at 10. The essential element is that the threat be such that a reasonable person would find it credible, based on what that person has experienced and witnessed. *See Carranza–Hernandez*, 12 F.3d at 7–8.

■ Second, the statute protects against persecution not only by government forces but also by nongovernmental groups that the government cannot control. *See, e.g., Elias–Zacarias*, —— U.S. at —— – ——, 112 S.Ct. at 814–15 (forced recruitment by Guatemalan guerrilla organization); *Artiga Turcios v. INS*, 829 F.2d 720, 722 (9th Cir.1987) (persecution by anti-government Salvadoran guerrillas). The BIA opinion did not purport to say otherwise, yet by implication minimized Sotelo's claim of persecution by saying that it was "directed to his local hometown of Villa El Salvador" and that an "asylum claim is not established where a claim based on non-governmental action involves a local area of a country," citing *Matter of Fuentes*, 19 I. & N.Dec. 658 (BIA 1988). *In re Sotelo*, slip op. at 11. The comment made in the *Fuentes* decision, however, did not cite to any authority and was made in a context distinguishable from our case. There the applicant presented evidence of danger to himself if he returned to his hometown, but he in fact lived in another city for two years before leaving the country and during that time was allowed to visit his mother on weekends in their hometown. In contrast, Sotelo's fear drove him first into hiding and then led him to flee the country altogether. He does not know where his wife and children are but believes they are still living in Villa El Salvador under the protection of other CUAVES members.[3]

---

**3.** The BIA stated that Sotelo "gave no indication that his common-law-wife and children have had any problems." *In re Sotelo*, slip op. at 10. It also acknowledged, however, that he "does not know the whereabouts of his wife and children in Peru." *Id.* at 4. We note that Sotelo did not affirmatively state that his wife and children were living unhindered in Villa El Salvador. Rather, he testified that the family was in hiding at the time he fled Peru, and he does not know the exact location where they are now living.

The BIA itself attested to the broad scope of the Shining Path's operations when it found that "[t]he documentary material in fact establishes that the Shining Path's reaches in Peru are countrywide whenever they desire to pursue their goals by violent means." *Id.* at 8. To the extent that the BIA elsewhere in its decision implied that Sotelo would be safe if he simply moved away from Villa El Salvador, we note that such a suggestion is not supported by the record here or by the BIA's own finding on the broad reach of the Shining Path.

The record and the BIA's findings compel the conclusion that Sotelo had a well-founded fear of persecution on account of his political opinion and actions opposing the Shining Path.

### III.

The standard of proof for withholding of deportation is more stringent than for granting asylum. *Carranza–Hernandez,* 12 F.3d at 7. An applicant for withholding of deportation must demonstrate a clear probability that his life or freedom would be threatened on account of one of the five enumerated reasons if deported to his country of origin. 8 U.S.C. § 1253(h)(1); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 430, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987). The "clear probability" standard requires a showing that it is " 'more likely than not that the alien would be subject to persecution' " if deported. *Cardoza–Fonseca,* 480 U.S. at 423, 107 S.Ct. at 1208 (quoting *INS v. Stevic,* 467 U.S. 407, 429–30, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984)). If this standard is satisfied, withholding of deportation is mandatory unless a statutory exception applies. 8 U.S.C. § 1253(h)(1); *Carvajal–Munoz v. INS,* 743 F.2d 562, 568 (7th Cir.1984).

As noted above, we reverse the BIA's denial of Sotelo's claim for asylum and remand for further proceedings as appropriate. We also set aside the BIA's denial of Sotelo's request for withholding of deportation because it was based solely on the BIA's denial of the asylum claim, which we have now reversed. We remand for further proceedings to consider the withholding of deportation request under the higher standard applicable to that claim.

---

Other CUAVES members offered to protect them after Sotelo left Peru.