# In re S-M-J-, Applicant

*Decided January 31, 1997*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) General background information about a country, where available, must be included in the record as a foundation for an applicant's claim of asylum and withholding of deportation.

(2) Where the record contains general country condition information and an applicant's claim relies primarily on personal experiences not reasonably subject to verification, corroborating documentary evidence of the asylum applicant's particular experience is not required; but where it is reasonable to expect such corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided or an explanation should be given as to why such information was not presented. *Matter of Dass,* 20 I&N Dec. 120 (BIA 1989); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), clarified.

(3) The Immigration and Naturalization Service should play an active role in introducing evidence regarding current country conditions.

(4) Although the burden of proof is not on the Immigration Judge, if background evidence is central to an alien's claim and the Immigration Judge relies on the country conditions in adjudicating the alien's case, the source of the Immigration Judge's knowledge of the particular country must be made part of the record.

FOR APPLICANT: Jeannette Freeman, Esquire, Atlanta, Georgia

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Grace A. Sease, Assistant District Counsel

BEFORE: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, and GUENDELSBERGER, Board Members. Concurring Opinion: ROSENBERG, Board Member.

HEILMAN, Board Member:

The applicant, a citizen of Liberia, has timely appealed from the Immigration Judge's decision dated June 7, 1995, denying asylum and withholding of exclusion and deportation. The sole issue on appeal is whether the applicant is eligible for those forms of relief. The record will be remanded.

## I. FACTS

According to the applicant's affidavit attached to her Request for Asylum in the United States (Form I-589), in 1989, when the Liberian Government was overthrown, the applicant was living in Zaire. She had been living there since 1987 with her uncle, who had been appointed the Liberian ambassador to Zaire. She remained in Zaire until 1991, when she was evacuated to the United States through the assistance of the American Embassy in Zaire, and she was granted parole until March 29, 1992.

The applicant indicated that in 1990, while living in Zaire, she saw on television on the Cable News Network that the area where she used to live in Liberia, including her father's house, had been burned down. She indicated that her father's house had been singled out and burned. She said that her father was the governor of the Vai tribe in Liberia and stated, "I'm scared if I go back to Liberia I might be affected too." She indicated that although the Vai tribe, of which she is a member, has not had any trouble with the Liberian Government, she feared that members of other tribes might seek to harm her because of her father's position. The applicant has not spoken to either of her parents since 1989 and does not know their whereabouts. The applicant also testified that "Prince Anderson" is her brother-in-law and that she fears repercussions as a result of her relationship to him.

Before we turn to the review of the applicant's case, we set out the analysis which we apply in determining whether an asylum applicant has met his or her burden of proof.

## II. EVIDENTIARY REQUIREMENTS

Although we recognize that the burden of proof in asylum and withholding of deportation cases is on the applicant, we do have certain obligations under international law to extend refuge to those who qualify for such relief. *See* United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150. Congress incorporated the international obligation into domestic United States law when it enacted the withholding of deportation provision of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, prohibiting the refoulement of refugees. Going beyond the nonrefoulement provision, Congress also established asylum as a discretionary form of relief for those who could meet a lesser standard of proof. *See* section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1994). Because this Board, the Immigration Judges, and the Immigration and Naturalization Service are all bound to uphold this law, we all bear the responsibility of ensuring that refugee protection is provided where such protection is warranted by the circumstances of an asylum applicant's claim. Further, in light of the bifurcated process experienced by many asylum applicants, whereby applicants begin with a nonadversarial approach at a Service Asylum Office and

move to a more "adversarial" proceeding before an Immigration Judge, a cooperative approach in Immigration Court is particularly appropriate.

## A. The Role of the Alien

### 1. Evidence of General Country Conditions

The burden of proof is on an applicant to establish her asylum claim. 8 C.F.R. § 208.13(a) (1996). We held in *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989), that an alien's own testimony may in some cases be the only evidence available, and it can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of the alien's alleged fear. *See also Matter of Mogharrabi*, 19 I&N Dec. 439, 446 (BIA 1987). Similarly, the regulations indicate that "[t]he testimony of the applicant, if credible in light of general conditions in the applicant's country of nationality or last habitual residence, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). Implicit in these statements is an assumption that the adjudicator will have some background information against which to measure an applicant's claim. In order to determine if an alien's claim is "credible in light of general conditions in the applicant's country," 8 C.F.R. § 208.13(a), or "plausible," *Matter of Dass, supra*, at 124, 125, an adjudicator must understand the general country conditions. Therefore, general background information about a country, where available, must be included in the record as a foundation for the applicant's claim. This point bears emphasis because many applicants, such as the applicant here, seek to rely solely on their testimony without either offering any background information or explaining its absence.

Because the burden of proof is on the alien, an applicant should provide supporting evidence, both of general country conditions and of the specific facts sought to be relied on by the applicant, where such evidence is available. *Matter of Dass, supra*, at 124. If such evidence is unavailable, the applicant must explain its unavailability, and the Immigration Judge must ensure that the applicant's explanation is included in the record. Moreover, general country condition information may be necessary to support an applicant's testimony where the alien's claim is based on allegations which may be independently verified. "[W]hen the basis of an asylum claim becomes less focused on specific events involving the respondent personally and instead is more directed to broad allegations regarding general conditions in the respondent's country of origin, corroborative background evidence that establishes a plausible context for the persecution claim (or an explanation for the absence of such evidence) may well be essential." *Matter of Dass, supra,* at 125. As we indicated in *Dass*, this position is consistent with the Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para.

42, at 12 (Geneva, 1992) ("*Handbook*"), which notes that an "applicant's statements cannot, however, be considered in the abstract, and must be viewed in the context of the relevant background situation." The *Handbook* summarizes the role of the asylum applicant, stating that he or she should do the following:

> (i) Tell the truth and assist the examiner to the full in establishing the facts of his case.
>
> (ii) Make an effort to support his statements by any available evidence and give a satisfactory explanation for any lack of evidence. If necessary he must make an effort to procure necessary evidence.
>
> (iii) Supply all pertinent information concerning himself and his past experience in as much detail as is necessary to enable the examiner to establish the relevant facts. He should be asked to give a coherent explanation of all the reasons invoked in support of his application for refugee status and he should answer any questions put to him.

*Id*. para. 205(a)(i)-(iii), at 48-49.

The *Handbook* recognizes that:

> [a]fter the applicant has made a genuine effort to substantiate his story there may still be a lack of evidence for some of his statements . . . . [I]t is hardly possible for a refugee to "prove" every part of his case . . . . It is therefore frequently necessary to give the applicant the benefit of the doubt.

*Id*. para. 203, at 48. The *Handbook* recommends, however, that the benefit of the doubt only be given "when all available evidence has been obtained and checked and when the examiner is satisfied as to the applicant's general credibility. The applicant's statements must be coherent and plausible, and must not run counter to generally known facts." *Id*. para. 204, at 48.

## 2. Evidence to Support the Alien's Particular Claim

Where the record contains general country condition information, and an applicant's claim relies primarily on personal experiences not reasonably subject to verification, corroborating documentary evidence of the asylum applicant's particular experience is not required. Unreasonable demands are not placed on an asylum applicant to present evidence to corroborate particular experiences (e.g., corroboration from the persecutor). However, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided. That is, an asylum applicant should provide documentary support for material facts which are central to his or her claim and easily subject to verification, such as evidence of his or her place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment. If the applicant does not provide such information, an explanation should be given as to why such information was not presented. For example, if an applicant claims persecution based on her activities as vice-president of a union for 2 years, she should provide some corroborating evidence indicating that she held the office of vice-president or an explanation of why she did not provide such corroborating evidence. The absence of

such corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof.

We point this out to clarify *Matter of Mogharrabi, supra*, in which we first stated that an "alien's own testimony . . . can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his fear." *Id*. at 445. We further stated in *Matter of Mogharrabi:*

> Where the country at issue in an asylum case has a history of persecuting people in circumstances similar to the asylum applicant's, careful consideration should be given to that fact in assessing the applicant's claims. A well-founded fear, in other words, can be based on what has happened to others who are similarly situated. The situation of each person, however, must be assessed on its own merits.[1]

*Id*. at 446.

Consequently, we also expect general corroborating evidence, from a reliable source, of persecution of persons in circumstances similar to an applicant where such information is reasonably available. In the example of the union vice-president, for example, we would expect general information that union members in her country faced persecution. However, specific documentary corroboration of an applicant's particular experiences is not required unless the supporting documentation is of the type that would normally be created or available in the particular country and is accessible to the alien, such as through friends, relatives, or co-workers.

Although the burden of proof in establishing a claim is on the applicant, the Service and the Immigration Judge both have a role in introducing evidence into the record.

## B.  The Role of the Service

The Service, of course, should also play a significant role at the asylum hearing. The trial attorney may call witnesses and should present evidence to support any argument it makes regarding the applicant's eligibility for asylum or withholding of deportation. *See* 8 C.F.R. §§ 236.3(c)(4), 242.17(c)(4)(iv) (1996). Such evidence should be used to examine an applicant regarding his or her claim. The more background information the Service has about the applicant's country, the more thorough and intelligent the examination will be.

If the Service opposes a grant of asylum, independent evidence to support its opposition often is critical. Such an approach would not only be effective at the hearing; it would also enable the Board to better evaluate an asylum

---

[1] We note that this standard contemplates the introduction of evidence regarding similarly situated persons to support an *individual* claim of persecution. This situation is distinct from the use of evidence of the persecution of similarly situated persons to establish a well-founded fear of persecution *where there is no claim of individualized persecution*, i.e., in a pattern or practice claim. *See* 8 C.F.R. § 208.13(b)(2)(i).

applicant's claim from the record developed at the hearing. For example, if we find on appeal that an asylum applicant has met her burden of proof and is otherwise eligible for asylum and the Service had failed to provide any evidence to counter her claim, we would find no basis for denying the asylum application.

Moreover, as we noted above, the Service has an obligation to uphold international refugee law, including the United States' obligation to extend refuge where such refuge is warranted. That is, immigration enforcement obligations do not consist only of initiating and conducting prompt proceedings that lead to removals at any cost. Rather, as has been said, the government wins when justice is done. In that regard, the handbook for trial attorneys states that "[t]he respondent should be aided in obtaining any procedural rights or benefits required by the statute, regulation and controlling court decision, of the requirements of fairness." Handbook for Trial Attorneys § 1.3 (1964). *See generally Freeport-McMoRan Oil & Gas Co. v. FERC*, 962 F.2d 45, 48 (D.C. Cir. 1992)(finding astonishing that counsel for a federal administrative agency denied that the A.B.A. Code of Professional Responsibility holds government lawyers to a higher standard and has obligations that "might sometimes trump the desire to pound an opponent into submission"); *Reid v. INS*, 949 F.2d 287 (9th Cir. 1991)(noting that government counsel has an interest only in the law being observed, not in victory or defeat).

As a general matter, therefore, we expect the Service to introduce into evidence current country reports, advisory opinions, or other information readily available from the Resource Information Center.

## C. The Role of the Immigration Judge

Thus far, we have emphasized the need for the parties to introduce supporting documents into the record. We note, however, that even after the parties have had an opportunity to introduce supporting documents into the record, the Immigration Judge may be left with an inadequate record. Although the burden of proof is not on the Immigration Judge, if background information is central to an alien's claim, and the Immigration Judge relies on the country conditions in adjudicating the alien's case, the source of the Immigration Judge's knowledge of the particular country must be made part of the record. The Act states that in deportation and exclusion proceedings, an Immigration Judge "*shall* administer oaths, *present and receive evidence*, interrogate, examine, and cross-examine the alien or witnesses." Section 242(b) of the Act, 8 U.S.C. § 1252(b)(1994) (emphasis added); *see also* section 236 of the Act, 8 U.S.C. § 1226 (1994). Thus, the statute specifically recognizes that the presentation of evidence is a proper function of an Immigration Judge.

The regulations also require that an Immigration Judge seek evidence in cases where the Immigration Judge receives an application for asylum that has not been referred by an asylum officer. The Immigration Court "shall forward a copy to the Department of State pursuant to § 208.11." 8 C.F.R. §§ 236.3(b), 242.17(c)(3). "At its option, the Department of State may provide detailed country conditions information addressing the specific conditions relevant to eligibility for refugee status . . . ." 8 C.F.R. § 208.11(a) (1996).

Moreover, in order to fully explain the reasons for the decision, the Immigration Judge should consider background evidence. A decision rendered by the Immigration Judge in deportation proceedings "shall also contain a discussion of the evidence pertinent to any application made by the respondent [for asylum or withholding of deportation] and the reasons for granting or denying the request." 8 C.F.R. § 242.18(a) (1996). An adverse decision in an asylum case "will state why asylum or withholding of deportation was denied." 8 C.F.R. §§ 236.3(d), 242.17(c)(5). Further, "[a]ny such information relied upon by an immigration judge in deciding a claim for asylum or withholding of deportation shall be made part of the record . . . ." 8 C.F.R. § 208.11(a). We recognize that over time, Immigration Judges will accumulate significant knowledge from their experience involving the conditions in numerous countries. However, any evidence relied upon by the Immigration Judge must be included in the record so that the Board can meaningfully review any challenge to the Immigration Judge's decision on appeal.[2]

Background evidence often is particularly important to an Immigration Judge's credibility determination. As previously noted, an adjudicator must have general background information about a country in order to determine if an asylum applicant's testimony is "credible in light of general conditions in the applicant's country," 8 C.F.R. § 208.13(a), or "plausible," *Matter of Dass, supra*, at 124, 125. In other words, in the ordinary case, credibility determinations must not be made in a vacuum.

Thus, in considering a persecution claim, an adjudicator must consider the testimony against the background information. Cases have arisen, however, where an Immigration Judge first considers testimony as a discrete portion of the record and, at that point, makes a "credibility" determination. After that is done, the Immigration Judge considers the background information and separately weighs that evidence. In such circumstances, it has not been unusual for an Immigration Judge to determine that testimony is "credible" in the same decision with a subsequent discussion of the background information

---

[2] The Board, of course, has the authority to take administrative notice under certain circumstances. *See, e.g., Kaczmarczyk v. INS*, 933 F.2d 588, 593-94 (7th Cir.), *cert. denied*, 502 U.S. 981 (1991); *de la Llana-Castellon v. INS*, 16 F.3d 1093, 1096 (10th Cir. 1994). Nevertheless, the Board is not required to independently take administrative notice of relevant country conditions, particularly where the alien does not provide any such evidence. *Fisher v. INS,* 79 F.3d 955 (9th Cir. 1996); *Liu v. Waters*, 55 F.3d 421, 427 (9th Cir. 1995).

containing findings that are in conflict with the testimony. Adverse credibility determinations are appropriately based on inconsistent statements, contradictory evidence, and inherently improbable testimony; and where these circumstances exist in view of the background evidence on country conditions, it is appropriate for an Immigration Judge to make an adverse credibility determination on such a basis. *See generally Artiga-Turcios v. INS*, 829 F.2d 720, 723 (9th Cir. 1987); *Damaize-Job v. INS*, 787 F.2d 1332, 1338 (9th Cir. 1986) (regarding discrediting factors); *Matter of B-*, 21 I&N Dec. 66 (BIA 1995). Testimony is not a discrete, self-contained unit of evidence examined and weighed without context; it is part of the body of evidence which is intertwined and considered in its totality. Although we recognize that an Immigration Judge can make an adverse credibility determination independent of country condition information, e.g., based on inconsistent statements, we find that general country condition information is essential for an Immigration Judge's evaluation of an applicant's credibility. Immigration Judges, therefore, should place general country condition information into evidence.

We note, however, that there may be instances in which an Immigration Judge finds an applicant to be credible, but finds that she has failed to meet her burden of proof. For example, it may be that an applicant's testimony is plausible in light of general country condition information, but that it is overly general. In such a case, we would find that the applicant had failed to meet the required burden of proof, but an adverse credibility determination would not be appropriate.

Although not binding on Immigration Judges, various guidelines for asylum adjudicators recommend the introduction of evidence by the adjudicator. For example, the *Handbook* states: "[W]hile the burden of proof in principle rests on the applicant, the duty to ascertain and evaluate all the relevant facts is shared between the applicant and the examiner." *Handbook, supra,* para. 196, at 47. The role of the asylum adjudicator is to "[e]nsure that the applicant presents his case as fully as possible and with all available evidence." *Id*. para. 205(b)(i), at 49.

Similarly, the *Basic Law Manual*, prepared by the Asylum Division and Office of the General Counsel of the Service for its asylum officers, recognizes the need for an asylum adjudicator to acquire information on the general country conditions. U.S. Dept. of Justice, INS, *The Basic Law Manual, U.S. Law and INS Refugee/Asylum Adjudications* (1994). It states that "[t]he asylum officer should be fully familiar with the reports and country profiles developed by the INS Resource Information Center, with the Department of State's Country Reports of Human Rights Practices for the country being considered and with reports from Amnesty International and other reputable organizations, including academic institutions." *Id*. at 100.

Therefore, in adjudicating an application for asylum, the Immigration Judge ordinarily should state for the record how the testimony or other

evidence presented comports with the background information relating to the specific claim. If no such information is in the record, we expect the Immigration Judge to explain how the testimony has been assessed and how its plausibility or implausibility has been established without such information.[3]

## III.  APPLICATION OF EVIDENTIARY REQUIREMENTS TO APPLICANT'S CASE

### A.  The Applicant Failed to Provide Sufficient Supporting Evidence

We find that the applicant has not provided sufficient evidence to meet her burden of proof. *See* 8 C.F.R. § 208.13. We note preliminarily that the applicant has not provided any general information about country conditions in Liberia, nor has she explained whether such evidence is unavailable. Consequently, there is no background information against which to judge her claim. For example, the record does not contain information about the Vai tribe, such as who might seek to harm members of the tribe. There is not even independent evidence to indicate that the tribe exists. The applicant also did not provide information as to who "Prince Anderson" is, what role he played in Liberia, or why anyone affiliated with him might be targeted. In fact, the applicant has not identified any faction or tribe who might have an inclination to persecute those affiliated with Prince Anderson or the Vai tribe. *See Matter of Mogharrabi, supra.* Further, the applicant has not provided any explanation for the lack of information on these issues. We note that the applicant attached an affidavit to her Form I-589 in which she provides background information about Liberia, such as where it is located, how it was founded, and how political tensions in the country developed. However, general information about the history or political climate in a country should, where available, be provided through corroborative background evidence such as country reports provided by a credible source or an expert witness. *See Matter of Dass, supra,* at 125. The applicant is not an expert witness.

Regarding the aspects of the applicant's testimony that involve her own personal experience, we find that the applicant has failed to satisfy her burden of submitting evidence that is sufficiently detailed to provide a coherent account of the basis of her fear. *See Matter of Dass, supra*, at 124; *Matter of Mogharrabi, supra.* The applicant's testimony was general and did not provide additional details about, for example, her experience as a Vai tribe member. Further, she has not indicated how her alleged persecutor could become aware of her tribal affiliation, her father's political position, or her relationship to Prince Anderson. Moreover, the information in the applicant's

---

[3]  As we noted above, the burden of proof is on an applicant to establish her asylum claim. We do not intend our analysis regarding the roles of the Service and the Immigration Judge to shift this burden. If the Service and the Immigration Judge do not carry out their roles, the applicant does not prevail by default.

affidavit does not provide additional detail about specific events in which she was involved. An asylum applicant's own testimony, whether in the form of in-court testimony or an affidavit, should focus on the particular circumstances of her case. Consequently, the applicant has failed to satisfy her burden of presenting testimony that is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for her fear. *See Matter of Dass, supra; Matter of Mogharrabi, supra.*

Although we find that the applicant has not met her burden of proof, we do not find that she is incredible. The evidentiary standard set out above and in *Matter of Dass, supra*, requires that the applicant provide background evidence so that her claim can be evaluated in the broader context of the conditions in her country. Even if an alien is found to be credible, if there is no context within which to evaluate her claim, she has failed to meet her burden of proof because she has not provided sufficient evidence of the foundation for her claim. A failure of proof is not a proper ground per se for an adverse credibility determination. The latter finding is more appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony. *See Artiga-Turcios v. INS, supra; Damaize-Job v. INS, supra; Matter of B-, supra.*

The applicant correctly points out on appeal that an alien applying for asylum based on a well-founded fear of persecution shall not be required to provide evidence that she would be singled out individually for persecution if she establishes that there is a pattern or practice in her country of persecution of persons similarly situated to the applicant on account of one of the enumerated grounds of a group in which the applicant claims membership. 8 C.F.R. § 208.13(b)(2)(i).

The applicant claims that she is identified with Charles Taylor through her father's former position as governor of Vai and through her brother-in-law's position as a supporter of Taylor. The applicant has not provided evidence to meet the regulatory requirements for a pattern or practice claim, however. First, the applicant has not provided evidence to indicate that there is a pattern or practice of persecution of Taylor supporters in Liberia. *See* 8 C.F.R. § 208.13(b)(2)(i)(A). Secondly, the applicant has not established that she is similarly situated to persons being persecuted in Liberia. *See* 8 C.F.R. § 208.13(b)(2)(i)(B). For example, assuming arguendo that there is a pattern or practice of persecution of Taylor supporters in Liberia, the applicant has not established how her father is linked to Taylor, or what Prince Anderson's role in support of Taylor has been. It is not clear whether either of her relatives is identifiable as a Taylor supporter, and, as discussed above, it is not clear whether the applicant's association with her father and brother-in-law is identifiable.

### B. The Service and the Immigration Judge Failed to Provide Background Evidence About Liberia

Preliminarily, we note that the Service trial attorney questioned the applicant regarding her testimony, but did not introduce any evidence to contradict the applicant's claim or to suggest it is implausible.

Similarly, the Immigration Judge in the instant proceeding did not present or receive objective evidence against which the applicant's claim could be measured. We note that although the Immigration Judge indicated that he had "considered the State Department advisory [opinion]," the only report from the Department of State's Bureau of Human Rights and Humanitarian Affairs in the record relates to Zaire, not Liberia. In fact, the February 3, 1995, request from the Immigration Court to the Bureau of Human Rights and Humanitarian Affairs reflected the applicant's nationality as "Zaire." Although the applicant indicated that she had lived in Zaire, she never indicated that she has any legal status there, and she is a citizen of Liberia. Further, the Bureau of Human Rights and Humanitarian Affairs submission does not indicate that it reviewed the applicant's application from the standpoint of her being a native and citizen of Liberia. The additional material attached to its response suggests that such was not the case. It may be that the Immigration Judge considered a report from the State Department regarding the country conditions in Liberia, but no such report was specifically identified or made a part of the record.

The Immigration Judge concluded that the applicant "fears going back to her country because there is a very active civil war raging there." He further noted that "there's no showing that she would be anymore at risk than any other citizen in Liberia." The Immigration Judge appears to have evaluated the applicant's claim in light of his knowledge of country conditions in Liberia, but the record does not provide us with the basis for that knowledge. Consequently, in considering the applicant's appeal, it is difficult for us to evaluate the propriety of the Immigration Judge's conclusions.

## IV. CONCLUSION

Under ordinary circumstances, we would be inclined to dismiss the applicant's appeal based on her failure to meet her burden of proof. However, the regulations provide that applications for asylum must be forwarded to the Department of State for review and possible comment. *See* 8 C.F.R. §§ 208.11, 236.3(b), 242.17(c)(3). In addition, the regulations require that country conditions information "relied upon by an immigration judge . . . shall be made part of the record and the parties shall be provided an opportunity to review and respond to such information prior to the issuance of a decision." 8 C.F.R. § 208.11(a). In this case, where the request to the Department of State referenced the wrong country of nationality, where its response only included information relevant to Zaire, where the Immigration Judge relied

on information not included in the record, and where the only country report in the record is for the wrong country, we will remand the record for further proceedings at which these deficiencies can be corrected and the application for asylum further considered. The parties should be provided the opportunity to present any further evidence regarding the applications for asylum and withholding of deportation, or to explain its absence.

Accordingly, the following order will be entered.

**ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion.

*CONCURRING OPINION:* Lory D. Rosenberg, Board Member

I respectfully concur.

Our decision today is intended to clarify and provide notice to the applicant and guidance to the Immigration and Naturalization Service and the Immigration Judge of our expectations concerning the parties' responsibility for the production of evidence and the creation of a record in asylum hearings. In particular, we address both the need for documentation of general country conditions which must be included in the record "as a foundation for the applicant's claim," *Matter of S-M-J-,* 21 I&N Dec. 722, 724 (BIA 1997), or where relied on by the Immigration Judge, and a requirement that certain supporting evidence specific to the applicant's claim should be provided when it is available.

Perhaps what is most important about this decision is what we are not holding. Nowhere do we propose that an asylum seeker is presumed to be fabricating her claim or otherwise to lack credibility. *Figeroa v. INS,* 886 F.2d 76 (4th Cir. 1989) (emphasizing that the fact an applicant is an alien does not mean the Board is entitled to presume he is a liar). In addition, we do not presume that certain forms of supporting evidence of material facts "easily subject to verification," *Matter of S-M-J-, supra*, at 725, are readily available in the case of every applicant or necessarily required for the alien to satisfy her burden of proof. In other words, there is no presumption that an asylum applicant's testimony is to be treated as other than truthful, and there is no presumption that the "absence of such corroborating evidence" alone supports a finding that "an applicant has failed to meet her burden of proof. *Id*. at 726.

While I concur in the instant decision, I write separately to elaborate on these matters, which I consider vital to the application of this decision in practice.

## I. ASYLUM CONSIDERATIONS

With the advantage of computer technology, television news, and film, which have made our study of history and current events more accessible, we can easily envision the situation of one forced to flee her country. We can see

the poverty, the political repression, the exploitation, the corruption, the religious intolerance, or the ethnic divisions which gave rise to the conflict that escalated to the point where the applicant or a family member was persecuted or is likely to be persecuted. Perhaps she has been forced to sever all ties with family, tribe, friends, and co-workers, leaving her country and those she knew and loved behind. She now may be in a situation and environment totally foreign to her, only to find that the conditions which motivated her flight have deteriorated even further, and that she has lost contact with or become separated from associates or family members.

It is also possible to have a different vision: to see this same person as an opportunist, who would perpetrate a fraud. In that case we see a person who, through technology and other sources, has heard about asylum in the United States and who is using our laws simply to gain access to a life in our country, at our expense. She knows that we can never fully verify her testimony or ascertain the validity of her supporting documentation. No one likes to be fooled or played for a fool. Moreover, as the administrative body charged with ultimately determining these claims, we are responsible to see that the asylum system is not abused, but is extended fairly to qualifying asylum seekers. Given the potential for deceit, and our legitimate desire to protect the integrity of the process, how do we determine whether this person really warrants our protection?

The unique circumstances of the refugee or asylum seeker among other potential noncitizens applying for a legitimate status in the United States under our immigration laws is not a matter of controversy. Various provisions of congressional enactments, including the language of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), recognize and give deference to the circumstances of refugees and asylum seekers. *See, e.g.*, section 242B(e) of the Immigration and Naturalization Act, 8 U.S.C. § 1252b(e) (1994), currently in force, where Congress exempts asylum seekers from statutory bars to relief imposed on other aliens who failed to appear at a properly scheduled deportation hearing or to depart following a grant of permission to leave voluntarily; *see also* sections 304(a)(3), 306(a)(2) of the IIRIRA, (to be codified at 8 U.S.C. §§ 1230(b)(7),(c)(6)(C)(ii), 1252(a)(2)(B)(ii)); 61 Fed. Reg. 18,900, 18,905 (1996) (to be codified at 8 C.F.R. § 3.2(c)(3)(ii)).

At the Board level, as the author of today's opinion recognized some years ago,

> the purpose of the asylum provision would be better served by abandoning the fixation with the manner in which the asylum applicant arrived . . . . The asylum provisions are humanitarian in their essence and indeed recognize that the forces which impel persons to seek refuge may be so overwhelming that the "normal" immigration laws cannot be applied in their usual manner.

*Matter of Pula*, 19 I&N Dec. 467, 476 (BIA 1987) (Heilman, concurring) (citing the United Nations Convention and Protocol Relating to the Status of Refugees, the "international agreement which the asylum provisions implement"). While the concurring Board Member there referred to substantive considerations concerning an alien's manner of entry, his statement is no less applicable to the procedural standards which we impose on the asylum applicant with regard to his or her burden of proof.

## II. BURDEN OF PROOF

With these considerations in mind, I turn to the imposition of the burden of proof in the immigration laws as applied in their "usual manner." *Matter of Pula, supra*, at 476. The approach we have taken is to place the burden of proof on the applicant to prove, by evidence which in some cases may consist only of her credible testimony, past persecution or a reasonable fear of persecution. *INS v. Cardoza Fonseca*, 480 U.S. 421 (1987). In fact, as we explain in our opinion, placing the burden on the applicant for protection in this way is consistent with international law. However, in so placing the burden, it is important to note our recognition of the essential role played by the "benefit of the doubt." *See* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* paras. 203, 204, at 48 (Geneva, 1992) ("*Handbook*").

In concurring in this opinion, I do not understand it to increase the applicant's burden. I understand our decision to clarify both *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), and *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989), earlier decisions in which we addressed the asylum applicant's burden of proof, to better allocate the burden and to specify our expectation that an applicant either provide, or offer an explanation for the absence of, supporting documentation related to "material facts which are central to his or her claim and easily subject to verification." *Matter of S-M-J-, supra,* at 725.

We recognize that evidentiary considerations in asylum cases must be judged by standards which take into account the situation of the asylum seeker. For example, the United States Court of Appeals for the Ninth Circuit recognized that "omitting a corroboration *requirement* may invite those whose lives of freedom are not threatened to manufacture evidence . . . . But the imposition of such a requirement would result in the deportation of many people whose lives genuinely are in jeopardy." *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1984) (emphasis added)(stating that persecutors are not likely to provide their victims with evidence of their motives); *see also Matter of S-M-J-, supra*, at 725.

The concept of the responsibility for establishing a record being shared by both the parties and the Immigration Judge is especially appropriate in the

context of asylum adjudications, where we are carrying out international obligations, as codified by Congress, to provide refuge to those facing actual or feared persecution. Our imposition on the parties and the Immigration Judge alike of the responsibility to provide evidence of general conditions where available or relied upon, while a practical change, is not particularly controversial as a matter of law. It is consistent with the regulations generally and with the specified role contemplated for the adjudicator of an asylum application. *See, e.g.*, 8 C.F.R. § 208.1(a) (1996) (stating this part shall apply to all applicants for asylum whether before an asylum officer or an Immigration Judge); 8 C.F.R. § 208.12 (1996)(stating that the adjudicator may rely on information from a variety of sources ranging from the Department of State to credible international organizations or academic institutions).

An allocation of the asylum applicant's burden, which looks to the submission of supporting evidence as a reasonable adjudicatory aid intended to facilitate a reasoned and fair decision, is consistent, both with the current regulations and with those currently proposed by the Attorney General to implement the provisions of the IIRIRA. *See* 8 C.F.R. § 208.13(a) (1996), which holds that testimony which is credible in light of general conditions may sustain an applicant's burden; *see also Matter of S-M-J-, supra*, at 3. By contrast, however, imposition of a higher burden absolutely requiring such evidence would conflict, not only with established case law, but also with regulations promulgated by the Attorney General which we do not have the authority to supersede. *Matter of Ponce De Leon,* 21 I&N Dec. 154 (BIA 1996).

As we have stated only recently, credibility concerning individual fears or events particular to the individual applicant is not diminished or called into question by the absence of corroboration; unrefuted and credible testimony alone is perfectly adequate to satisfy the applicant's burden of proof of a threat. *Matter of H-*, 21 I&N Dec. 337, 340 (BIA 1996). The courts have affirmed our acknowledgment that an applicant's burden can be met once general background information places the applicant's consistent and coherent testimony in context. *See Sotelo-Aquije v. Slattery*, 17 F.3d 33, 36 n.2 (2d Cir. 1994) (finding the suggestion of an extra requirement of corroboration excessive where the Board found credible testimony which was supported by general documentary evidence), *rev'd on other grounds,* 62 F.3d 54 (2d Cir. 1995); *see also Sotel-Aquije v. Slattery*, 62 F.3d 54, 56-57 (2d Cir. 1995). In addition, any inferences drawn concerning the implausibility of factual allegations must themselves be supported by substantial evidence. *Aguilera-Cota v. INS*, 914 F.2d 1375, 1381 (9th Cir. 1990).

Thus, our opinion should not be read to impose upon the individual asylum applicant the necessity of providing more than her credible testimony to satisfy her burden, if that is all that is available. To the contrary, what I understand the Board to restate is our understanding that testimony which is "believable, consistent and sufficiently detailed" alone will suffice to satisfy the alien's burden under certain circumstances. *Matter of Mogharrabi,*

*supra*, at 445; *see also Cardoza-Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir. 1985) (noting that establishment of objective facts through testimony alone does not make them any less objective), *aff'd*, 480 U.S. 421 (1987). What we are clarifying is that, as a general rule, where corroborating evidence is available, particularly evidence which is documentary in nature or otherwise objective, it should be provided, as it is useful in substantiating the applicant's claim.

## A. The Practical Disabilities of the Applicant

Observance of our international obligations, which one might presume would involve primarily humanitarian considerations, unfortunately has come to include a significant policing function. At the same time, we cannot allow this factor to overcome our awareness that real victims of persecution very often have little available to them in the way of supporting evidence, testimonial or documentary, to support their claims. *See Plateros-Cortez v. INS,* 804 F.2d 1127 (9th Cir. 1986); *Bolanos-Hernandez v. INS, supra; Margano v. Pilliod*, 299 F.2d 217 (7th Cir. 1962) (holding an applicant requesting political asylum is entitled to considerable latitude in presenting evidence), *cert. denied*, 370 U.S. 924 (1962); *see also Matter of Pula, supra* (Heilman, concurring); *Matter of Joseph*, 13 I&N Dec. 70, 74 (BIA 1968) (stating that the applicant must have a "reasonable opportunity to present his proofs for the stakes are high"); *Matter of Silhasle*, 11 I&N Dec. 533 (BIA 1960) (acknowledging that the applicant's testimony must be accorded the most careful and objective evaluation). Moreover, our decision states clearly that we do not place unreasonable demands on the asylum applicant to corroborate personal experiences not reasonably subject to verification. *Matter of S-M-J-, supra*, at 725.

In addition, we should realize that a good portion of the peoples of the world remain semi-literate and may adhere to different cultural norms, which may affect how an asylum applicant recounts events, seeks or obtains corroboration, or explains the inability to provide supporting documentation. Confronted with an adversary process, many individuals may have difficulty presenting corroborating evidence that satisfies the standards we employ without expert and effective legal representation. *See Castro-O'Ryan v. INS,* 847 F.2d 1307 (9th Cir. 1988). In addition, an accurate, verbatim interpretation of testimony presented at the hearing is essential; and not only is the skill level of an interpreter a significant factor, but the political and psychological dynamics which flow from the introduction of a third party into the asylum hearing may be relevant in assessing the record.

Even more critical, we must understand that many asylum seekers are confined in Service detention. Do the rules of the institution allow such an individual to make an overseas telephone call without money, on credit? Can she even place such a call at all? May such an individual contact her family by

letter and manage to receive a response before her hearing actually takes place? Even if the applicant is able to communicate with her family, how can they provide her with the information or corroboration which she needs without endangering themselves?

And even if the applicant has the freedom and finances to obtain such corroborating evidence, can she seek and receive it within the time we set for her hearing? I recall a time, when I was a lawyer in pro bono practice, when long after I submitted his application, my client finally received information on tissue-thin paper, tucked into a false front of an international air letter which his co-worker had unsealed and re-glued to protect it from being intercepted by the authorities of his country. We must be careful to consider when impediments attendant to the asylum applicant's situation have prevented the orderly or even the timely presentation of evidence that would corroborate the material facts which may be central to a specific claim. In the vast majority of cases, where internally credible testimony is provided, both the practical disabilities experienced by many asylum applicants, and the *Handbook's* recognition that no refugee is likely to be able to prove every aspect of her claim, favor our extending the benefit of the doubt in determining whether the applicant has met her burden.

## B. The Service's Access to Evidence

In *Matter of Vivas*, 16 I&N Dec. 68 (BIA 1977), we held that while the Service has the burden of proof in a deportation case to establish deportability by evidence which is clear, unequivocal, and convincing, a respondent may be required to go forward with evidence when the Service has made a prima facie case and the respondent has better control or knowledge of the evidence. In that case, the Board stated specifically that the rule enunciated, shifting the burden of going forward with evidence to the party not bearing the burden of proof, is not new to either criminal or civil proceedings. *See, e.g., United States v. Fleishman*, 339 U.S. 349 (1950); *see also Campbell v. United States*, 365 U.S. 85 (1961); *Government of Virgin Islands v. Lake,* 362 F.2d 770 (3d Cir. 1966); *Rhay v. Browder*, 342 F.2d 345 (9th Cir. 1965).

We recognized that this principle should apply, in particular, when a party is under a "serious practical handicap." *Matter of Vivas, supra,* at 70. It is difficult to imagine a more comparable situation than the asylum context, where it is the applicant's burden to establish a well-founded fear of persecution. *See INS v. Cardoza-Fonseca, supra*. Therefore, I view the Service's responsibility in these proceedings to require not only the production of evidence pertaining to general country conditions, but to require that the Service provide any other evidence, either within its possession or readily accessible, which supports the contentions made by the applicant. *Matter of S-M-J-, supra*, at 730 n.3.

As I read the law, what this means in the context of our opinion today, is that when a respondent has provided straightforward and uncontradicted testimony which establishes a prima facie claim of persecution warranting a grant of asylum, as well as a reasonable contention that she cannot provide corroborating documentation, the burden should shift to the Service. At this point, as the majority explains, the Service should present any evidence it has, supporting or contradicting the applicant's asylum claim. If the Service does not refute the claim made by the applicant, then it would appear that, even in the absence of specific documentation corroborating claims related to identity, membership or official status, or medical attention, the applicant has satisfied his or her burden of proof. *Id.* at 726-727.

## III. CREDIBILITY CONSIDERATIONS

Thus, we confront the centrality of testimonial credibility in asylum determinations. Should we believe the foreigner? How do we assist the legitimate asylum seeker and weed out those cases in which claims or representations made in support of claims are fraudulent? What criteria are appropriate in assessing this aspect, which so often goes to the outcome of an asylum claim?

We have stated that credible testimony, alone, may satisfy the applicant's burden, but that the absence of corroborating evidence related to material facts central to the applicant's claim "can lead to a finding that an applicant has failed to meet her burden of proof." *Matter of S-M-J-, supra,* at 726. Two aspects of this evaluation are especially critical. One is how we determine the credibility of the applicant's testimony generally. The other is how we judge the "reasonableness" of our expectation that corroborating evidence is available, and how we determine the "reasonableness" of an asylum applicant's explanation for failing or being unable to provide such evidence.

In my view, we should avoid any predisposition against believing the applicant who may be unable to obtain supporting documentation at all, or who manages to submit documents which corroborate only part of her contentions. I stress that while the burden of proof is borne by the asylum applicant, our law does not include a presumption that an applicant is unbelievable. If as adjudicators we intentionally or subjectively approache an asylum applicant and presume an individual to be a liar rather than a truth teller, we violate not only our duty to be impartial, but we abrogate the statute and regulations which govern our adjudications.

### A. Applications Involving Common Claims or Unfamiliar Contentions

Although an asylum application calls for an individual adjudication, our knowledge or lack of knowledge of external factors may affect the adjudication. In this we must allow the benefit of the doubt, as opposed to cynicism, to prevail. It is more reasonable to conclude, for example, that a similarity in the

content of claims substantiates the reality of the claimed persecution than to conclude that an applicant's story is fabricated. *Bolanos-Hernandez v. INS, supra*. Similarly, the unique character of a claim which raises unfamiliar contentions is not a sufficient basis to disbelieve otherwise internally consistent testimony.

History has demonstrated that some of the most offensive, inhumane, and intolerable forms of discrimination, abuse, and torture were those which the international community either failed to acknowledge or could not bring itself to admit until long after such abuses resulted in persecution which decimated populations. For example, there are some, even today, who continue to insist that the Holocaust, in which millions of Jews, gypsies, homosexuals, and communists were interned and murdered by the Nazis, simply never occurred.

The possibility that an individual adjudicator may not be familiar with the particular organization to which the applicant claims to belong, or with the particular history in the country of persecution affecting religious, ethnic, tribal, political or other prejudice or strife, or with the relevance of geography or other circumstances which underlie the situation narrated by the applicant, is no measure by which to judge credibility. When the applicant has made a genuine effort to substantiate her story, and there is no reason to question the applicant's credibility, the applicant should be given the "benefit of the doubt." *Handbook* paras. 203, 204, at 48.

## B. Internal Consistency of Application and Testimony

Comparison of an application in English (from a non-English-speaking and often semi-literate applicant) with testimony presented in court with the assistance of an interpreter is, in my view, an ineffective and often unfair measure of credibility. *See Osorio v. INS*, 99 F.3d 928 (9th Cir. 1996). Instead, the application should be considered as a component part of the applicant's evidence, viewed on the record as a whole. *Matter of Fefe*, 20 I&N Dec. 116 (BIA 1989) (emphasizing that testimony which may add to or elaborate on the information provided in the application is appropriate and reasonable).

While prior statements typically are acceptable means for challenging present testimony, in the asylum context these applications are often prepared by well-meaning friends, family, or religious or community advocates, who may fail to probe for details, misunderstand or even embellish information given, and never read the content of the application back verbatim to the applicant. Equally as common is the question and answer approach generally undertaken by notaries, unauthorized practitioners, and some attorneys who approach the asylum application process as a source of high-volume income. Clearly, application of the law "as usual" is not appropriate. *Matter of Pula, supra*, at 476.

Furthermore, the often traumatic circumstances giving rise to asylum applications commonly result in information coming out seriatim rather than the entire claim being presented in one piece. In particular, studies of gender based claims have revealed that "[w]omen applicants may have difficulty speaking about past experiences that are personally degrading, humiliating or culturally unacceptable" and that "because of the very delicate and personal issues arising from sexual abuse, some women claimants may understandably have inhibitions about disclosing past experiences to male interviewers" or through male interpreters. Coven, U.S. Dep't of Justice, *Considerations for Asylum Officers Adjudicating Asylum Claims from Women* 5 (1995); *see also Matter of Kasinga,* 21 I&N Dec. 357 (BIA 1996).

The point of an inquiry or review is never to isolate or seize upon technical inconsistencies between the written application and oral testimony in order to justify a denial of asylum. In keeping with our recognition that our government has a duty to uphold international law, *Matter of S-M-J-, supra*, at 723, 727, it is rather to seek to elicit detail that establishes a reasonable likelihood of persecution and satisfies the applicant's burden.

## C. Evaluation of Supporting Documentation

What constitutes corroboration establishing a plausible story or what is no more than merely self-serving evidence may be more in the eye of the beholder than in the ability of an asylum applicant to document her claim. The cynical adjudicator who believes that any document can be, and probably is, fabricated will not only reject those documents determined by an official forensic laboratory to be conclusively fraudulent. Any handmade piece of "official," but homemade stationary or other paper of lesser quality than the business letterhead to which we in the United States are accustomed, can be subject to doubt. The adjudicator who may erroneously perceive his or her job as being to repel the majority of asylum seekers, notwithstanding the controlling statute, regulations, and case law, can readily conclude that, if they cannot be rejected as fabricated, letters or other documentation from family, doctors, religious leaders, or organizational leaders should be dismissed as self-serving. *Damaize-Job v. INS,* 787 F.2d 1332 (9th Cir 1986); *see also Kahassi v. INS*, 16 F.3d 323, 326 (9th Cir. 1994) (holding that credibility could be evaluated favorably when the applicant's testimony was based on what she learned as a child since there is a distinct difference between providing such a description and reciting a fabricated story). Thus, the mere requirement of documentation is no guarantee that an adjudicator will be satisfied that a claim is both real and legitimate.

It is critical to understand the anomaly created by the concept of "self-serving documentation." The fact that such evidence may advance an applicant's cause does not mean it is not admissible or entitled to due weight. *See Dawood-Haio v. INS*, 800 F.2d 90, 96 (6th Cir. 1986). It was error for an

Immigration Judge to find a witness unbelievable merely because his testimony helped his cause. Jang Man Cho v. INS, 669 F.2d 936, 940 n.6 (4th Cir. 1982); *see also Matter of Mazar*, 10 I&N Dec. 79, 81 (BIA 1962). Furthermore, it would be nonsensical to so hold, as such an approach would achieve only the "anomalous and unfair result" of accepting as true that part of an alien's testimony that undermines his case, while rejecting that which supports it. Henry G. Watkins, *Credibility Findings in Deportation Proceedings: "Bear[ing] Witness Unto The Truth*," 2 Geo. Immigr. L.J. 231, 259 (1988) (citing *Navia-Duran v. INS*, 568 F.2d 803, 807 (1st Cir. 1977) (stating that an adjudicator's reliance on a portion of the testimony that undermines a claim may indicate acceptance of the veracity of all of the testimony)).

## D. Reasonable Explanation for Unavailable Documentation

In our decision today we have set forth two "reasonableness" determinations that need to be made in assessing the adequacy of the asylum applicant's evidence. One is whether it is reasonable to expect that the applicant's personal experiences are easily subject to verification. The other is whether in such a case, the explanation given by an asylum applicant for failing to provide such documentation is a reasonable one. In making these "reasonableness" determinations we should be guided by the standard we employ in related credibility assessments. However, if we are reluctant to base our decision on the merits solely on otherwise consistent and credible testimony of an applicant for asylum, will we accept her equally straightforward (but uncorroborated) explanation of the unavailability of supporting documentation?

The federal courts have not been shy in recognizing the often unsupportable subjective and conjectural conclusions periodically drawn by adjudicators. Certainly, we have not demonstrated consistently an ability to reasonably judge individual events occurring outside our own society. For example, a finding that it was "astonishing" that after being chased and shot at by guerrillas, and then beaten by the same guerrillas, an applicant was released rather than killed, does not set forth a specific cogent reason to disbelieve the applicant. *Mosa v. Rogers*, 89 F.3d 601, 605 (9th Cir. 1996); *Lopez-Reyes v. INS*, 79 F.3d 908 (9th Cir. 1996) (finding a Guatemalan who was released by his torturers not incredible because he was not killed); *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir. 1987); *see also Nasseri v. INS,* 34 F.3d 723, 725 (9th Cir. 1994), *overruled on other grounds, Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996); *Perez-Alvarez v. INS,* 857 F.2d 23, 24 (1st Cir. 1988) (adopting concurring opinion of Board Member which stated that in considering claims of persecution it is "highly advisable to avoid assumptions about how other societies operate"); *Matter of D-V-*, 21 I&N Dec. 77 (BIA 1993) (finding that despite the Immigration Judge's conclusion that further harm was "pure speculation," a Haitian woman subjected to gang rape was known to agents of persecution and could be harmed again).

These considerations are no less relevant in determining the reasonableness of obtaining verification of a claimant's personal experiences, or the unavailability of supporting evidence of those claims, than they are to assessing the fundamental credibility of an applicant's testimony concerning persecution. Adjudicators are regularly faced with difficult determinations of fact and of law as applied to those facts. Indeed, this may in part underlie our clarifying today the applicant's responsibility to provide objective documentation, or to submit a reasonable explanation for being unable to provide it. We should take the utmost care not to import the understandable desire to achieve certainty or remove doubt in our decisions into the further adjudication we establish here today. Our evaluation under this decision of what constitutes a "reasonable explanation," again, must rely upon our openness to that explanation untarnished by any adverse presumption.

## IV. CONCLUSION

Given our holding today, the fact that an applicant may be in a position to offer more supporting evidence that may make his or her claim more persuasive is not to say that in some cases simple testimony may not be perfectly adequate to satisfy the burden of proof. Ultimately, establishing eligibility for asylum cannot turn on the satisfaction of a rigid and technical evidentiary formula. Our responsibility is to extend protection to those who demonstrate by even a significant degree less than a preponderance of the evidence a possibility of persecution on a ground recognized in the Act. *Cardoza-Fonseca v. INS, supra*. Under the law of the Supreme Court, the federal courts, and this Board, the absence of corroborating evidence alone should not be dispositive. What is dispositive is whether the applicant has set forth the subjective and objective elements of a fear of persecution on a protected ground that is plausible in light of existing country conditions.