

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-24-2005

# Tahiraj v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-1521

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Tahiraj v. Atty Gen USA" (2005). *2005 Decisions*. Paper 655.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/655

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-1521

ARDIAN TAHIRAJ,
                                        Petitioner

v.

ALBERTO GONZALES,[*] ATTORNEY
GENERAL OF THE UNITED STATES
                                        Respondent

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS
Agency No. A79-329-844

Argued:  April 4, 2005

Before: BARRY, AMBRO, and COWEN, <u>Circuit Judges</u>

(Opinion Filed: August 24, 2005)

---

[*]Attorney General Alberto Gonzales has been substituted for former Attorney General John Ashcroft, the original respondent in this case, pursuant to Fed. R. App. P. 43(c).

Marco Pignone, III, Esq. (Argued)
Wilson & Pignone
117 South 17th Street
Suite 908
Philadelphia, PA  19103

Counsel for Petitioner

Stacy S. Paddack, Esq. (Argued)
Anthony W. Norwood, Esq.
Douglas E. Ginsburg, Esq.
John D. Williams, Esq.
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, D.C.   20044

Counsel for Respondent

---

OPINION

---

BARRY, Circuit Judge

Ardian Tahiraj, a native and citizen of Albania, petitions for review of a February 9, 2004 final order of the Board of Immigration Appeals ("BIA").  The BIA dismissed Tahiraj's appeal from an Immigration Judge's ("IJ") decision denying Tahiraj's applications for asylum, withholding of removal, and protection under the Convention Against Torture.  The BIA also denied Tahiraj's motion to remand the case to allow him to submit additional evidence.  We have jurisdiction pursuant to 8 U.S.C. § 1252(a), and

2

will deny the petition.

## I.

We will limit our factual discussion to those events relevant to our decision. Tahiraj was born in Albania in 1970. According to his testimony, he formally joined Albania's Democratic Party on August 4, 1994, although he became an active supporter of that party in 1990. In 1990, Tahiraj participated in a demonstration in his hometown of Patos in support of a student movement. When government agents intervened to end that demonstration, Tahiraj was struck by a government agent and lost consciousness. He testified that he was arrested and brought to a police station, where he was interrogated and mistreated by both a police officer and a member of the Sigurimi, Albania's secret police.

Tahiraj also claimed that, beginning with the March 22, 1992 election, he served as a campaign worker for the Democratic Party. He wrote propaganda, worked on the campaign team of a party official, and served as an election observer. While campaigning for the June 29, 1997 elections, Tahiraj asserted, he and his cousin, Zihni Delibashi, were riding in a caravan of cars behind a police escort when the caravan was attacked by machine gun fire and Delibashi was shot. Though the caravan had been transporting the party official to a meeting, it turned back, returned the official to his office, and brought Delibashi to a hospital.

According to Tahiraj, he remained active in the Democratic Party, serving as an

3

election monitor for an October 1, 2000 mayoral election. After refusing to certify that election because of voting irregularities, Tahiraj was arrested by the police and allegedly beaten, threatened, and held for one night. Tahiraj was again arrested by police on October 16, 2000. He claimed that on this occasion he was beaten and held along with other individuals who, like him, had peacefully protested a celebration for a former dictator. During a ten-hour detention, the police cuffed him, urinated on his face, and threatened to kill him if he "talked back".

Ultimately, Tahiraj obtained a fake passport and fled Albania on November 4, 2000, claiming that his life was in danger and that he would be killed if he returned. Tahiraj testified that, after he left Albania, his wife received several threats after refusing to reveal his whereabouts, including a threat that their son would be kidnaped.[1] On June 25, 2001, Tahiraj applied for asylum with the former Immigration and Naturalization Service ("INS"). After concluding that he had failed to prove eligibility for asylum, INS referred the case to the IJ for a hearing.

In a thirty-six page opinion, in which the most careful consideration was given to the issues before him, the IJ denied Tahiraj's application and ordered him removed. The IJ stated that while he was not inclined to make an adverse credibility finding, he was concerned with Tahiraj's failure to corroborate certain aspects of his testimony.

---

[1]Tahiraj's wife, Majlinda, and son are now lawful permanent residents of the United States, having won an immigrant visa through the Diversity Visa program.

Specifically, the IJ observed that statements submitted by both Tahiraj and his wife failed to mention the threats which were allegedly made to his wife after Tahiraj left Albania. The IJ made "a favorable credibility finding with a caveat that the [IJ] has some credibility concerns with regard to the alleged threats communicated through respondent's wife." App. at 32-33.

Despite crediting much of Tahiraj's account, the IJ concluded that Tahiraj's "brief detentions" and attendant "mistreatment" in October 2000 did not support a finding of past persecution and the detention in 1990 did not trigger the presumption of future persecution because "it was perpetrated by a prior regime that is no longer in power." Id. at 33. The IJ also concluded that Tahiraj "has not proven that it is more likely than not that he would be tortured by or at the instigation of or with the consent or acquiescence of a public official" should he return to Albania. Id. at 33-34. In coming to this conclusion, the IJ considered and relied on the Human Rights Watch Report for 2002 and the Country Report on Human Rights Practices for 2001. See id. at 34-37. Although he believed it was a "relatively close call," the IJ found that Tahiraj would not be persecuted beyond "mere harassment and brief detentions" should he return to Albania and participate in opposition politics. Id. at 39.

Returning to the issue of the continuing threats supposedly received by Tahiraj's wife, the IJ noted that there was no mention of any such threats in Tahiraj's application for asylum, in his wife's letter, or in his sworn supplemental statement, which, he stated,

5

he submitted prior to the hearing to provide "'more details about [his] asylum claim'" and

"'to inform the Court about new political developments in Albania which [we]re relevant

to [his] asylum claim.'" Id. at 41. Having determined that Tahiraj's testimony regarding

continuing threats should have been corroborated, the IJ concluded that he could not give

that testimony significant weight.

On appeal, the BIA concluded that Tahiraj should have corroborated not only his

testimony regarding the continuing threats made to his wife, but also his testimony

regarding his two arrests and detentions in October 2000. Id. at 5 (citing Abdulai v.

Ashcroft, 239 F.3d 542 (3d Cir. 2001)).

> He was able to obtain a June 2002 statement from his wife, a June 2002
> "certification" from an official in the Democratic Party, a June 2002
> declaration from the leader of the Democratic Party in his area until 1994
> and a member of Parliament in 1996, and testimony from his cousin who
> was wounded in the 1997 shooting incident. These are persons who should
> be familiar with some or all of the essential facts either directly or at least
> through other persons. Hearsay evidence is admissible in immigration
> proceedings.

Id. at 5. The BIA also concluded that in addition to his failure to corroborate the threats

and the October 2000 arrests and detentions, Tahiraj's explanations for failing to do so

were "unconvincing":

> Even though he testified that persons have threatened his wife, and even
> threatened to kidnap his son, to find out where he is, his only explanation
> for the lack of any reference to this as well as to the two arrests and
> detentions by his wife was that he did not ask her to write the whole story.
> In addition, it makes no sense that the Democratic Party official would
> mention the confrontation with the Socialist Party militants and the police
> during the 2000 election, but neglect to mention the subsequent arrest and

6

detention because he did not believe it to be "important." Furthermore, the respondent did not claim that the member of parliament did not know about the respondent's arrests in 2000, but claimed that the official was not asked to write "further information." In short, several persons had the opportunity to refer to significant events in the respondent's life, but failed to do so.

Id. at 6.

Finally, the BIA denied Tahiraj's motion for a remand to enable the IJ to consider an affidavit from Tahiraj's wife claiming that she had received threatening, anonymous letters after Tahiraj left Albania, reasoning that Tahiraj had not adequately explained his failure to obtain this statement prior to the hearing before the IJ. This petition for review followed.

## II.

The crux of Tahiraj's argument to us is that, given the IJ's favorable credibility determination, the corroborating evidence he produced was sufficient to sustain his burden of proof as to a well-founded fear of future persecution.[2] We find this argument unpersuasive.

In Abdulai v. Ashcroft, 239 F.3d 542, 551 (3d Cir. 2001), we held that the BIA may require a credible applicant to provide evidence corroborating the specifics of his or her testimony if it is "'reasonable' to expect the applicant to do so." "[I]f it would be

---

[2] The government contends that Tahiraj has waived any claim to eligibility for asylum based on past persecution, withholding of removal, or protection under the CAT by failing to raise any of these claims in his opening brief. In light of our disposition of this case, we decline to address this issue.

reasonable to expect corroboration, then an applicant who neither introduces such evidence nor offers a satisfactory explanation as to why he or she cannot do so may be found to have failed to meet his or her burden of proof." Id. However, before denying the applicant relief on this ground, the BIA must undertake a three-part inquiry:

> (1) an identification of the facts for which it is reasonable to expect corroboration; (2) an inquiry as to whether the applicant has provided information corroborating the relevant facts; and, if he or she has not, (3) an analysis of whether the applicant has adequately explained his or her failure to do so.

Id. at 554 (quotation marks omitted) (citing In re S-M-J-, 21 I. & N. Dec. 722 (1997)).

Here, the BIA cited Abdulai and discussed each requirement. It specified the particular aspects of Tahiraj's testimony that one would reasonably have expected him to corroborate, noted that Tahiraj had not provided the requisite corroboration, and explained why his proffered reason for not providing corroboration was inadequate. This case is, therefore, distinguishable from cases such as Mulanga v. Ashcroft, 349 F.3d 123 (3d Cir. 2003), where the IJ failed to explain what evidence would reasonably be expected and neglected to provide the applicant with an opportunity to explain its absence. See id. at 136. See also Voci v. Gonzales, 409 F.3d 607, 617 & n.7 (3d Cir. 2005).

Having determined that there was no technical problem with the BIA's analysis, we must review its conclusions. BIA precedent establishes that it is reasonable to expect an applicant to corroborate "facts which are central to his or her claim and easily subject

8

to verification," such as "evidence of [the applicant's] place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment." In re S-M-J-, 21 I. & N. Dec. at 725. "The Board has also stated that it is generally reasonable to expect applicants to produce letters from family members remaining in the applicant's home country." Abdulai, 239 F.3d at 554. "[A]n applicant's ability to obtain corroborating evidence may often depend on the social and political circumstances of a given country." Id. at 555 n.9.

The October 2000 arrests and detentions and the alleged threats were central to Tahiraj's claim of fear of future persecution, especially in light of the conceded inadequacy of proof of past persecution. Furthermore, the corroborating evidence was easy to obtain. Tahiraj asked his wife to write a statement and, wholly apart from the fact that one would have expected her on her own to lead off with the threats made to her, Tahiraj could simply have asked her to mention those threats and his arrests and detentions in October 2000. The Democratic Party officials could also have been asked to mention the October 2000 incidents. Tahiraj's cousin testified in detail regarding the June 1997 shooting and, again, could have been asked to testify as to the October 2000 incidents, even if his knowledge was based on hearsay.[3]

Finally, we agree that Tahiraj's explanations as to why he did not provide any

---

[3] Tahiraj argues that the BIA erred in requiring him to corroborate his claim with hearsay statements, but it did no such thing. The clear implication from the BIA's statement is that hearsay was one way Tahiraj could have tried to corroborate his claim.

corroboration of these incidents are less than convincing. It is not enough to say that the party officials did not deem these incidents to be important enough to include. Nor is Tahiraj's argument that it is generally difficult to obtain detailed statements from people outside the country particularly persuasive, considering that he successfully obtained statements from three people still living in Albania.[4]

Tahiraj makes much of what he did produce: (1) his passport, (2) his family certificate, (3) birth certificates for him and his wife and son, (4) his Democratic Party membership card, (5) a certificate from the Patos branch of the Democratic Party, (6) a newspaper article referencing the June 1997 shooting, (7) tax documents, (8) a declaration by a former Democratic Party official stating that Tahiraj campaigned with him, (9) a "certification" from a Democratic Party leader stating that Tahiraj was a member of the electoral commission in October 2000 and that Tahiraj was "confronted" by police and militants but "defended the votes for a fair process," and (10) his wife's letter, previously discussed. None of this evidence, however, corroborates Tahiraj's account of the arrests

---

[4] Tahiraj explains only why he did not obtain corroborating evidence, not why he could not. The test we upheld in Abdulai requires an applicant who fails to produce reasonable corroborating evidence to explain why he or she "cannot" do so, not why he or she "did not" do so. 239 F.3d at 551. In any event, our ability to review Tahiraj's argument in this regard appears to be largely foreclosed by the Real ID Act. The Act provides that "[n]o court shall reverse a determination made by a finder of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable finder of fact is compelled to conclude that such corroborating evidence is unavailable." Real ID Act of 2005, § 101(e), Pub. L. No. 109-13, 119 Stat. 231, 305, to be codified at 8 U.S.C. § 1252(b)(4). We see no compelling reason to reverse any such findings in this case.

and detentions in October 2000 or the continuing threats made to his family. Moreover, besides his wife's statement that Tahiraj "has even been hit and mishandled," none of the evidence describes physical abuse, arrest, or detention of any kind. Indeed, even Tahiraj does not allege that he was injured, much less that he suffered injuries requiring medical treatment. See Voci, 409 F.3d at 615; Chen v. Ashcroft, 381 F.2d 221, 234-35 (3d Cir. 2004).

We also reject Tahiraj's argument that the BIA erred when it denied his motion to remand. The BIA treats motions to remand as motions to reopen. In re Coelho, 20 I. & N. Dec. 464, 471 (1992). "A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered . . . was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1); see also INS v. Doherty, 502 U.S. 314, 323 (1992) (listing "failure to introduce previously unavailable, material evidence" as one of "at least" three independent grounds on which the BIA might deny a motion to reopen); In re Coelho, 20 I. & N. Dec. at 472 (same, citing 8 C.F.R. § 1003.2 and Doherty). Because Tahiraj has not demonstrated that his wife's follow-up affidavit was previously unavailable, we conclude that the BIA properly denied Tahiraj's motion.

### III.

For the foregoing reasons, the petition for review is denied.

11

AMBRO, Circuit Judge, dissenting

I join my colleagues in commending the Immigration Judge ("IJ") for his excellent opinion and especially for his willingness to acknowledge that he "believes that the findings in this matter are a relatively close call . . . ." *In re Tahiraj*, A79-329-844, at 33 (IJ Sept. 20, 2002) ("IJ Op."). That being said, it is the Board of Immigration Appeals' ("BIA") decision we review. The BIA avoided wrestling with the difficult issue of whether Tahiraj was entitled to asylum based on all of the events in Tahiraj's past by deciding that it did not have to consider some of them. For that and the other reasons noted below, I respectfully dissent.

**I.  The BIA could not reasonably expect Tahiraj to corroborate his two detentions in 2000.**

The BIA concluded that Tahiraj should have corroborated his testimony regarding his two detentions in October 2000. *In re Tahiraj*, A79-329-844, at 2 (BIA Feb. 9, 2004) ("BIA Op."). It reasoned that Tahiraj

> was able to obtain a June 2002 statement from his wife, a June 2002
>
> "certification" from an official in the Democratic Party, a June 2002
>
> declaration from the leader of the Democratic Party in his area until 1994
>
> and a member of Parliament in 1996, and testimony from his cousin who

was wounded in the 1997 shooting incident. These are persons who should

be familiar with some or all of the essential facts either directly or at least

through other persons. Hearsay evidence is admissible in immigration

proceedings.

*Id.*

In *Abdulai v. Ashcroft*, 239 F.3d 542 (3d Cir. 2001), we wrote that "if it would be reasonable to expect corroboration [of a credible asylum applicant's claim], then an applicant who neither introduces such evidence nor offers a satisfactory explanation as to why he or she cannot do so may be found to have failed to meet his or her burden of proof." *Id.* at 551. However, before denying the applicant relief on this ground, the BIA must undertake a three-part inquiry:

(1) an identification of the facts for which it is reasonable to expect

corroboration; (2) an inquiry as to whether the applicant has provided

information corroborating the relevant facts; and, if he or she has not, (3) an

analysis of whether the applicant has adequately explained his or her failure

to do so.

*Id.* at 554 (quotation marks omitted) (citing *In re S-M-J-*, 21 I. & N. Dec. 722 (1997)). Further, in *Dia v. Ashcroft*, 353 F.3d 228, 253 (3d Cir. 2003) (*en banc*), our Court

13

recognized that

> we have cautioned [that] "[i]t is obvious that one who escapes persecution in his or her own land will rarely be in a position to bring documentary evidence or other kinds of corroboration to support a subsequent claim for asylum. It is equally obvious that one who flees torture at home will rarely have the foresight or means to do so in a manner that will enhance the chance of prevailing in a subsequent court battle in a foreign land. Common sense establishes that it is escape and flight, not litigation and corroboration, that is foremost in the mind of an alien who comes to these shores fleeing detention, torture and persecution."

*Id.* at 253 (quoting *Senathirajah v. INS*, 157 F.3d 210, 215-16 (3d Cir. 1998)) (second set of internal quotation marks omitted).

I believe that the BIA did not satisfy *Abdulai's* first requirement as to Tahiraj's two detentions in 2000. It could not reasonably expect Tahiraj to corroborate these events. *See Dia*, 353 F.3d at 253 ("*At most*, an applicant must provide corroborating evidence only when it would be *reasonably* expected." (first emphasis added, second emphasis in original)).

My colleagues write that "Tahiraj argues that the BIA erred in requiring him to corroborate his claim with hearsay statements, but it did no such thing. The clear

14

implication from the BIA's statement is that hearsay was one way Tahiraj could have tried to corroborate his claim." Maj. Op. at 9 n.3. However, the four statements that the BIA speculated Tahiraj might have further corroborated his two detentions in 2000 would have *all* been hearsay.[5] Further, there appears to be no other evidence of the two detentions in 2000 that Tahiraj could have been reasonably expected to present.[6] Thus, as the four statements that the BIA speculated could corroborate Tahiraj's two detentions in 2000 would have been hearsay, and no other reasonable avenue of corroboration even exists, the BIA *did* require him to corroborate his claim with hearsay statements. While it is true that hearsay is permissible in immigration proceedings, that the type of evidence that the BIA expected from Tahiraj was hearsay is relevant to whether the BIA's expectation of that evidence was reasonable.

---

[5]First, second, and third: written statements from Tahiraj's wife or either of the two Democratic Party ("DP") officials—who were in Albania when Tahiraj appeared before the IJ, and who did not directly witness either of the detentions—would have been hearsay within hearsay. *Cf.* Fed. R. Evid. 805. Such statements would have been Tahiraj's wife's and the DP officials' out-of-court statements (the first level of hearsay) about Tahiraj's out-of-court statements to them (assuming any were ever even made) describing the detentions (the second level of hearsay). Fourth: Tahiraj's cousin—who arrived in the United States from Albania in 1998, two years before the detentions in 2000—would know about the detentions only from out-of-court statements by Tahiraj or his family (as the BIA implicitly acknowledged, BIA Op. at 2-3). Testimonial statements describing such statements would have been hearsay.

[6]The only people other than Tahiraj with firsthand knowledge of what occurred during the detentions in 2000 are Tahiraj's captors, and surely he cannot be reasonably expected to bring them here from Albania to give the IJ non-hearsay testimony about how they beat, urinated on, and threatened to kill Tahiraj. *See In re S-M-J-*, 21 I. & N. Dec. at 725 ("Unreasonable demands are not placed on an asylum applicant to present evidence to corroborate particular experiences (*e.g.*, corroboration from the persecutor).").

Furthermore, there is *no* evidence that Tahiraj ever told his wife, his cousin, or the DP officials anything about the two detentions in 2000 or that they otherwise knew anything about them. The BIA merely speculated that "[t]hese are persons who *should be* familiar with some or all of the essential facts either directly or at least through other persons." BIA Op. at 2 (emphasis added). It was not reasonable for the BIA to expect Tahiraj to present evidence, the existence of which was pure speculation. *Cf. Dia*, 353 F.3d at 253 ("'Unless the BIA anchors its demands for corroboration to evidence which indicates what the petitioner can reasonably be expected to provide, there is a serious risk that unreasonable demands will inadvertently be made. . . . What is (subjectively) natural to demand may not . . . be (objectively) reasonable.'" (quoting *Qui v. Ashcroft*, 329 F.3d 140, 153-54 (2d Cir. 2003))).

The primary reason the BIA unreasonably expected corroboration of the two detentions in 2000 is this: *because neither the BIA nor our Court has ever required an alien to present the type of statements the BIA demanded, Tahiraj had no way of knowing that he had to present such statements.* Neither the IJ, the BIA, my colleagues, nor the Government has cited a case in which the BIA or our Court has ever required an alien to present the type of statements the BIA described. How could it have been reasonable for the BIA to expect Tahiraj to read its mind and predict that it would change the law and require of him what it has never required of any asylum applicant before: statements about *hearsay statements* the BIA *speculated* the applicant made.

16

Even this new twist would not be so significant were it not that in most, if not all, previous asylum cases where corroboration of an asylum applicant's credible testimony was a potential issue, the BIA or our Court could have required such statements but did not. If the BIA and the majority are right about what the law is, then in what case could not the BIA or our Court have stated: "The events the alien credibly testified he experienced sound horrible. We speculate that he must have told some people about them. Because we do not have statements from those people about the statements we speculate the alien made to them, we will deny the applicant eligibility for asylum."? Neither the BIA nor our Court has ever made such a statement. Thus I believe the BIA has pushed the requirement of corroboration too far.

Additionally, it is reasonable to expect an asylum applicant to corroborate only "facts which are . . . easily subject to verification . . . ." *In re S-M-J-*, 21 I. & N. Dec. at 725. In *S-M-J*, the BIA enumerated examples of facts that are easily subject to verification: "evidence of [the applicant's] place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment." *Id.* It thus implied that facts are easily verified if they can be shown to be true by existing documentary evidence, such as official documents issued by governments or other usually reliable non-governmental organizations, reliable media accounts, or other documents from credible sources not created for litigation purposes. The narrative statements describing hearsay statements that the BIA speculates Tahiraj made are none

17

of these things. That the two detentions in 2000 were not easily subject to verification further supports that it was unreasonable for the BIA to require corroboration of them. *See Id.* ("[S]pecific documentary corroboration of an applicant's particular experiences is not required unless the supporting documentation is of the type that would normally be created or available in the particular country and is accessible to the alien . . . .").

The majority is correct *Abdulai* noted that "[t]he Board has also stated that it is generally reasonable to expect applicants to produce letters from family members remaining in the applicant's home country." 239 F.3d at 554. However, we were quick to add that "[i]n setting out this summary of the Board's case law, we express no opinion as to whether we agree that it is 'reasonable' to expect applicants for asylum or withholding of removal to corroborate these types of information." *Id.* at 555 n.9.

More importantly, the BIA precedent that we cited in *Abdulai* as potentially requiring letters from family members, *In re M-D-*, 21 I. & N. Dec. 1180 (BIA 1998), is vastly different from this case. 239 F.3d at 554-55. In *M-D-*, an asylum applicant from Mauritania claimed as follows: the military came to his house and arrested him and his family because of their ethnicity; he was separated from his family and detained for over a year and his family was forced to go to Senegal; after his release, he joined up with his family in a Senegalese refugee camp and lived with them for eleven months; and he then came to the United States, but his family remained in the camp. *Id.* at 1180-81.

The BIA held that the applicant had insufficiently corroborated his claim. *Id.* at

18

1184. It reasoned that "there is no evidence to confirm the respondent's purported Mauritanian nationality, a central element of his claim. No passport, birth certificate, or identification card has been submitted . . . ." *Id.* at 1183. In contrast to *M-D-*, to demonstrate his nationality and the nature of his involvement with the Democratic Party, Tahiraj presented, among other things, his passport, his family certificate, birth certificates for him, his wife and son, his DP membership card, a certificate from the Patos branch of the DP, a declaration by a former DP official stating that Tahiraj campaigned with him, and a "certification" from a DP leader stating that Tahiraj was a member of the electoral commission in October 2000 and that he was "confronted" by police and militants but "defended the votes for a fair process."

The BIA in *M-D-* also wrote that "the respondent has submitted *no* supporting evidence from his family, . . . . We find it reasonable to expect *some* corroboration of the respondent's identity, arrest, and detention, *or* at least of the family's forcible expulsion from Mauritania." *Id.* at 1183 (emphases added). This means, in effect, corroboration from family members of events they had witnessed or experienced (the alien's arrest and detention, or the family's expulsion from the country). There is no evidence that Tahiraj's family members had any knowledge of (let alone witnessed or experienced) his two detentions in 2000. Furthermore, in contrast to *M-D-*, Tahiraj *did* present corroborating evidence from his family members of events they witnessed or experienced. He presented his cousin's in-court, specific, detailed, credible testimony about the 1997

19

shooting, and his wife's brief statement indicating that "in the course of [Tahiraj's] political activity [he] has often found himself under the pressure and threats of Socialist Party supporters. He sometimes even has been hit and mishandled by them in front of his family."[7]

Moreover, "[w]here the record contains general country information, and an applicant's claim relies primarily on personal experiences not reasonably subject to verification, corroborative documentary evidence of the asylum applicant's particular experience is not required." *M-D-*, 21 I. & N. Dec. at 1182 (quoting *S-M-J-*, 21 I. & N. Dec. at 725). The BIA conceded that the Tahiraj *did* corroborate his two detentions in 2000 with general country information: "The background evidence shows that the police have arrested and abused Democratic Party members with the Democratic Party alleging that 21 of its supporters, local government officials, and former national party officials

---

[7]Tahiraj's wife's statement was not intended to be a comprehensive account of the experiences on which Tahiraj based his asylum claim. Its is only eight sentences long, and four of them relate to Tahiraj's decision to flee from Albania and his travel to the United States, as evidence of his date of entry for purposes of the one year filing deadline for asylum applications. Thus, it is plausible that Tahiraj's wife would not mention the two detentions in October 2000.

She also did not mention that men fired machine guns at Tahiraj and his cousin during a 1997 Democratic Party campaign trip. *See infra* Part II. Tahiraj's corroborated his testimony about the 1997 shooting with a newspaper article and his cousin's specific, detailed, and credible testimony. Thus the 1997 shooting appears to have occurred. This is an event one might expect Tahiraj's wife to include if she was reciting all of Tahiraj's experiences that were important to his asylum claim, yet she did not. Therefore, as the 1997 shooting apparently did occur and Tahiraj's wife did not mention it in her statement, it is quite plausible that the detentions in October 2000 occurred, even though she did not mention them in her statement.

were killed from 1997 to 1998[,] which generally corroborates the respondent's testimony about his two arrests." BIA Op. at 2. That Tahiraj corroborated his two detentions in 2000 with general country information further supports that it was unreasonable for the BIA to require further corroboration of them.

Finally, as for Tahiraj's testimony regarding his two detentions in 2000, the IJ found it credible. Tahiraj gave specific and detailed testimony about the following: his position with the Democratic Party; his concerns about the October 1, 2000 election irregularities; his October 2, 2000 arrest and interrogation about why he refused to sign off on the election results; how police beat and threatened him during the October 2 detention; the demonstration on October 16, 2000 and his subsequent arrest and detention, during which a police man who recognized him from the incident on October 2 urinated and threw the urine in his face and threatened to kill him if he talked back. IJ Op. at 11-13.

In *In re Y-B-*, 21 I. & N. Dec. 1136 (BIA 1998), the BIA required corroborative evidence because the asylum applicant's testimony was "general and vague." *Id* at 1139. By contrast, Tahiraj's testimony about his two detentions in 2000 was neither general nor vague. In *Y-B-*, the BIA stated that "the weaker an alien's testimony, the greater the need for corroborative evidence." *Id.* As need for corroboration is inversely proportional to strength of testimony, if an asylum applicant's testimony is sufficiently strong, there is no need for corroboration. That Tahiraj gave specific, detailed, and credible testimony about

his two detentions in 2000 (neither the IJ, the BIA, nor the majority claims otherwise) is still further support that it was unreasonable for the BIA to require corroboration of them.[8]

## II. The BIA's justification for not considering the 1997 shooting is not valid.

Both Tahiraj and his cousin credibly testified that in 1997 they, as well as a deputy of the DP, were on a campaign trip when men fired shots at their car with machine guns. Tahiraj's cousin was injured by one of the five bullets that hit the car and went to the hospital for treatment. Tahiraj credibly testified that, because the police did nothing about the shooting after he reported it, he believed the gunmen were Socialist Party

---

[8]The majority writes in a footnote that

> our ability to review Tahiraj's argument in this regard appears to be largely foreclosed by the Real ID Act. The Act provides that "[n]o court shall reverse a determination made by a finder of fact with respect to the *availability* of corroborating evidence . . . unless the court finds . . . that a reasonable finder of fact is compelled to conclude that such corroborating evidence is *unavailable*." Real ID Act of 2005, § 101(e), Pub. L. No. 109-13, 119 Stat. 231, 305, to be codified at 8 U.S.C. § 1252(b)(4). We see no compelling reason to reverse any such findings in this case.

Maj. Op. at 10 n.4 (emphases added). Neither Tahiraj nor I argue that the BIA erred in finding that corroborating evidence of the two detentions in 2000 was "available" (though I suspect such a finding would be speculative). Rather, even assuming such corroborating evidence was "available," the BIA could not reasonably expect Tahiraj to present such evidence.

members. IJ Op. at 10. Further, Tahiraj corroborated his and his cousin's account with a newspaper article referencing the 1997 shooting.

The BIA held that, in deciding whether Tahiraj had established past persecution or a well-founded fear of future persecution, it would not consider the 1997 shooting because

> the testimony of [Tahiraj] and his cousin regarding [it] *does not indicate that he was singled-out by the attackers on account of his political opinion.* The shots came from the rear and struck the last car of the police escorted convoy. The only person wounded was his cousin, who was sitting directly behind the elected Democratic Party . . . official riding in [the] front seat who appears to have been the target of the attack.

BIA Op. at 2 (emphasis added). The BIA erred because, for it to consider the shooting as some evidence that Tahiraj was eligible for asylum, Tahiraj did *not* need to show he was "singled-out" on account of his political opinion. Rather, he had to show the shooting was to some extent "because of" his political opinion. *See* 8 U.S.C. § 1158(b)(1)(A) & (b)(1)(B)(i); 8 U.S.C. § 1101(a)(42)(A). Even if Tahiraj was not "singled-out" by the gunman, he was put in danger *because of* his political opinion as (1) he put himself in the dangerous situation (the DP campaign trip) because of his political opinion (pro-DP), and (2) the gunmen created the danger because of their motive to suppress the pro-DP

23

political opinion.  Thus the BIA should have considered the 1997 shooting incident as some evidence of past persecution or a well-founded fear of future persecution.

### III.    We should remand to the BIA.

The BIA did not consider whether Tahiraj's two detentions in 2000 and the 1997 shooting give him a well-founded fear of future persecution and thus make him eligible for asylum.  Because the BIA's reasons for not considering these events were not legally valid, and because we may not raise this issue *sua sponte* and decide it *de novo*, we should remand so that the BIA may have the first opportunity to address the issue.  *See INS v. Ventura*, 537 U.S. 12, 15-16 (2002) (holding that the Ninth Circuit erred in addressing an issue not yet addressed by the BIA and stating that "[a] court of appeals 'is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.'  Rather, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985))).

It is worth noting, however, that Tahiraj's two detentions in 2000 and the 1997 shooting may, in fact, give him a well-founded fear of future persecution.  The question is whether he would face a "reasonable possibility" of persecution if he were to return to Albania.  8 C.F.R. § 208.13(b)(2)(i)(B).  If so, his fear of persecution is "well-founded." 8 C.F.R. § 208.13(b)(2)(i).   "One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occasion taking place."  *INS v.*

*Cardoza-Fonseca*, 480 U.S. 421, 431 (1987).  Even a 10% chance of persecution can be sufficient to establish a well-founded fear.  *Id.* at 440; *Knezevic v. Ashcroft*, 367 F.3d 1206, 1212 (9th Cir. 2004).

Persecution does not encompass all treatment our society regards as unfair or even unconstitutional, but it does include "threats to life, confinement, [and] torture . . . so severe that they constitute a threat to life or freedom."  *Fatin v. INS*, 12 F.3d 1223, 1240 (3d Cir. 1993).  Persecution must be "committed by the government or forces the government is unable or unwilling to control."  *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002).  Persecution must be on account of one of the statutorily enumerated bases, one of which is political opinion.  8 C.F.R. § 208.13(b)(1) & (b)(2)(i)(A).  Tahiraj credibly testified that because of his political opinion he was detained and beaten multiple times, received a death threat, had urine thrown on his face, and was shot at by the government or by forces the government was unable or unwilling to control.  Thus, he may have established past persecution (which would trigger a presumption of a well-founded fear of future persecution, 8 C.F.R. § 208.13(b)(1)).

But Tahiraj's best claim is that, aside from whether the two detentions in 2000 and the 1997 shooting constitute persecution, these events give him a well-founded fear of future persecution.[9]  If these events would make a reasonable person conclude that, were

_____

[9]Tahiraj testified that, in addition to the two detentions in 2000 and the 1997 shooting, after he left Albania his wife received several threats after refusing to reveal his whereabouts, including a threat that their son would be kidnapped.  While the BIA was

25

Tahiraj to return to Albania, he would face a significant chance of experiencing treatment that did rise to the level of persecution, then he could be eligible for asylum.

*   *   *   *   *

The BIA could not reasonably expect Tahiraj to corroborate his two detentions in 2000, and thus it should have considered them when it reviewed his asylum claim. Further, the BIA's justification for not considering the 1997 shooting is not valid. I would thus remand for the BIA to consider whether these incidents give Tahiraj a well-founded fear of future persecution. In this context, I respectfully dissent.

---

likely permitted to demand corroboration of the threats that his wife personally experienced, it did not have to do so. *See Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) (citing 8 C.F.R. § 208.13(a)) ("Testimony, by itself, is sufficient to meet [the] burden [of showing a well-founded fear of future persecution] if 'credible.'"); *Dia*, 353 F.3d at 253 ("'[C]orroboration is *not* required to establish credibility.'" (quoting *Senathirajah v. INS*, 157 F.3d 210, 215-16 (3d Cir. 1998) (emphasis added)). If the BIA had allowed these continuing threats to be considered, Tahiraj's claim of a well-founded fear of future persecution would be even better.