[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 24, 2009
THOMAS K. KAHN
CLERK

No. 08-15611
Non-Argument Calendar

_____

D.C. Docket No. A097-193-343

MIN THIHA TUN,

Petitioner,

versus

U. S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 24, 2009)

Before BIRCH, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

Min Thiha Tun petitions us for review of the Board of Immigration

Appeals' ("BIA") decision dismissing his appeal from the Immigration Judge's

("IJ") denial of his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c). On appeal, he argues that: (1) the IJ's adverse credibility determination was erroneous; (2) the IJ violated his due process rights at the removal hearing; and (3) the IJ and BIA erred in denying his claim for CAT relief. After review of the record and the parties' briefs, we DENY the petition.

## I. BACKGROUND

Tun, a native and citizen of Burma (now known as the Union of Myanmar),[1] filed an application for asylum, withholding of removal, and CAT relief in March 2003, alleging both past persecution and a well-founded fear of future persecution on account of his political opinion and membership in a particular social group. Tun stated in his application that his mother and father had been members of the National League for Democracy ("NLD") since 1988. He stated that although the NLD was legal, its members were "suppressed," and that both his parents were fired from their jobs because of their political activities. He stated that his parents

_____

[1]In 1989, the Burmese military government changed the country's name to "Myanmar." However, because the country is referred to as "Burma" in the proceedings below, we refer to Tun's native country as "Burma" rather than "Myanmar."

were, however, able to "continue their membership as township leaders." Tun himself became politically active when he joined the All Burma Student Democratic Front ("ABSDF") while he was in high school in the township of Yamethin. His duties included distributing pro-democracy leaflets and hanging posters at the school, which resulted in his being "black listed" and "watched" by the police. His father sent him to Mandalay to finish his education and, after passing his final exams in 1993, he enrolled at Meik Thi Lar[2] Government Technical Institute. Once there, he became a "secret leader" of a ten-member ABSDF cell and was responsible for disseminating propaganda, including pro-democracy pamphlets. Tun stated that he was arrested for distributing this literature, detained at the local military quarters, and interrogated for ten days. After signing a paper agreeing to "stay away from political movements," he was released. Although he was expelled from his dormitory, he was permitted to continue taking classes as a day student.

After graduating from the Meik Thi Lar Government Technical Institute in 1996, Tun was assigned to work as an apprentice at a shipyard. Around that time, Tun's two uncles, who had gone to Thailand in 1988, returned to Burma secretly

---

[2] Meik Thi Lar is referred to elsewhere in the record as "Mekthilar" or "Meiktila." See id. at 143, 356, 363.

and started an anti-government movement. Tun joined their movement and also worked for the NLD. As a result of his involvement with the NLD, he was arrested a second time and sent to a military prison, where he remained for seven months and was interrogated "with many kinds of tortures." He indicated that his uncles had been arrested two days before his own arrest, and that they were "still in jail [in Burma] for some crime."

Tun further alleged that upon being released, he was barred from attending the Yangon[3] Institute of Technology for his higher education on account of his political activism. This meant that he would never be able to obtain a university degree and would therefore have "no more future." Concerned for Tun's fate if he remained in Burma, and fearing he would be imprisoned for his political activities, Tun's parents bought him a working permit and passport and, on 7 February 1998, sent him abroad as a sailor. Tun ultimately entered the United States when the ship he was on arrived at a port in Tampa in May 2002, more than four years after he fled Burma. During the time between his leaving Burma and arriving in the United States, he learned from his parents that military intelligence officers "occasionally visited and asked about [him]." He indicated that because he was

---

[3]Yangon is the city formerly named Rangoon. The record below refers predominantly to Rangoon, instead of Yangon.

"still in [sic] the hook," he "had no choice but to try to stay in this free land to be away from Burmese military prisons."

In May 2003, the Department of Homeland Security ("DHS") served Tun with a Notice to Appear ("NTA"), charging him with removability under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without having been admitted or paroled. At an initial hearing, Tun appeared with counsel, admitted the allegations in the NTA, and conceded removability. Prior to the removal hearing, Tun submitted several documents in support of his claims for relief, including the 2004 and 2005 U.S. State Department Country Reports on Burma, both of which detailed the government's record of torture, violence, and political oppression. Although a number of the incidents reported occurred in Rangoon, neither Yamethin nor Mekthilar were specifically mentioned. In addition to the country reports, Tun also submitted: (1) a series of press releases and statements from the U.S. State Department regarding human rights practices in Burma; (2) an internet petition for the release of political prisoners in Burma; (3) a letter from Aung Zayya confirming Tun's participation in dissident activities and his resultant imprisonment; (4) a letter from Tin Win Thein vouching for Tun's political activism while in the United States; (5) a letter from Tun's uncle explaining that the government censors the mail and warning

5

Tun that he would be arrested if he returned home; (6) a letter from Tun's father detailing government censorship and oppression; and (7) a series of photographs and news articles reporting on protests in Burma and oppression by the government.

With the aid of a translator, Tun testified at his removal hearing that his mother and father were active members of the NLD and had opposed the ruling military government. His father had been a bank manager and his mother a nurse, but they both were terminated from their jobs because of their political activity. Tun's two uncles were also members of the NLD and were forced to flee the country from 1988 to 1996 on account of their political activity. Tun became politically active as a high school student, drawing political cartoons and distributing pro-democracy literature.

Tun testified that his first encounter with military police was in August 1994, when he was attending technical school in Mekthilar and leading a ten-member ABSDF group. Tun and the others in the group were detained at a military prison for ten days, during which time they were interrogated and yelled at, but not physically harmed. Upon Tun's release, the government cut his educational stipend and forced him to sign a declaration that he would not participate in political activities.

Tun further testified that after he finished his studies at the technical institute in June 1996, he worked as an intern for three months at a shipyard. In August of that year, he reunited with the rest of the nine ABSDF group members and his two uncles in Rangoon to protest the government and commemorate the anniversary of the founding of the NLD. Tun stated that his uncles had fled to the Thailand/Burma border in 1988 because the authorities were trying to arrest him, and remained there until 1996, when they returned secretly to Burma.[4] The IJ then asked Tun why his asylum application did not indicate that he ever lived in Rangoon but instead stated only that he lived in Yamethin from childhood until he left Burma in 1998. Tun explained that he did not understand how to fill out the asylum application properly, prompting the IJ to reply, "Well, this is why it's so difficult to follow your story. I don't know where you are in all of these different times. So now it's August 1996 and you and all of your nine friends and your two uncles all live in Rangoon City. Is that correct?" Tun answered affirmatively and explained that he lived with his aunt in Rangoon but did not work because although he had completed his internship, he lacked the requisite level of

---

[4] There was some confusion in Tun's testimony regarding when his uncles fled Burma. Tun first stated that "the year 1998 was the year that my two uncles went to Burma/Thailand and 1996 was the year they came back to Burma." Id. at 147. When the IJ pointed out that this "[didn't] make any sense," Tun clarified that he meant that his uncles fled in 1988, not 1998. Id. at 148.

7

education to obtain employment. He believed that the technical institute refused to issue him the certificate he needed in order to continue his studies at the university because of past political activities. The IJ then asked Tun the following questions:

> IJ: Well, I thought you said you graduated and you completed the apprentice work. I don't understand.
> Tun: So I finished only a diploma certificate.
> IJ: And what were you trying to get?
> Tun: So I was trying to get other diplomas and then while working, so I was trying to get more education.
> IJ: Do you have any documents to show that you were turned down for this certificate?
> Tun: No, sir.
> IJ: What makes you think they looked into your background and found something wrong with your background?
> Tun: I think they looked back at the time that I stick poster on the wall.
> IJ: What kind of grades did you get at this institute?
> Tun: So with all three subjects, I got over eighty.
> IJ: . . . . Well, did you fail some of your courses?
> Tun: No, I did not pass everything.
> IJ: So then you didn't graduate?
> Tun: So I got the three years diploma, but I did not get the degree.
> IJ: So how many classes did you fail?
> Tun: I did not fail, sir.
> IJ: . . . Go ahead, Mr. Druss. I didn't mean to take over. I just . . . wasn't understanding what was going on there.

Tun indicated that he did apply to the university in order to continue his studies but was turned down and that the university did not tell him why it had denied his application for admission. Tun surmised that he had been rejected due to his

8

political opinion because other politically active persons he knew, including his uncles, had had "the same problems."

Tun testified additionally on direct examination that on 24 September 1996, he distributed leaflets advising people not to support the military government and urging them to attend the NLD anniversary celebration as well as pamphlets containing information about democracy in general and the rights of the people. The following night, two military intelligence officers came to his aunt's house and arrested him. They blindfolded Tun and took him away in a truck. As soon as he got in the truck, one of the officers hit Tun in his back with the butt of a rifle while the other hit him in his knee with a stick. When the truck came to a stop, they pushed Tun out of the truck and continued to kick him in his knee as he lay handcuffed on the ground. The officers dragged Tun into a building, put him in a chair, removed his handcuffs, and tied his hands behind his back. While shining a flashlight in his eyes, they asked him questions about his political activities, specifically, where he got the leaflets, why he was distributing them, and why he was acting out against the government. During the interrogation, which lasted over an hour, the officers hit Tun on the back of his head with a stick and kicked him in the knees with their boots. When Tun told them that he was advocating for democracy, they hit him so hard he lost consciousness. The officers continued to

9

torture Tun the next day, making him crawl on rocks and "jump like a frog" with his hands behind his back, and refused to give him food and water for extended periods of time. Tun testified that this went on continuously for one week, but that the beatings decreased after the first month and ceased by the third month. Tun remained at the detention facility for seven months. On condition of being released, Tun was forced to sign an agreement not to participate in any anti-government groups.

Following his release, Tun stayed at his parents' house for two months and then returned to Rangoon. His father contacted someone who "help[ed] people to get out of Burma" and paid that person to get Tun a work permit, which would allow Tun to "work on the boat." Tun stated that he had been able to leave Burma because "everything had been arranged by the broker," who spoke to the border officers and led Tun through the government checkpoints. When asked by the IJ why he did not apply for asylum in any of the several other countries through which the ship passed before arriving in the United States, Tun stated that he feared that he would be arrested and sent back to Burma if he applied for asylum in those countries. He told the IJ that if he returned to Burma, "[he] would suffer more serious torture than [he] suffered before," and that "[his] life would be ended in the prison." When asked why he believed that, Tun told the IJ that he had

learned from his father and uncles that Burmese authorities routinely came to Tun's parents' home looking for him and had placed "more restriction[s] on [his] relatives."

On cross-examination, Tun testified that he did not mention that he had been tortured during his asylum interview because he was not directly asked about torture and, due to his limited English, he did not thoroughly understand the question. Tun denied that he could safely relocate to another part of Burma, even if he stopped participating in political activities, because he had a "black mark in [his] past," and the authorities "would find some occasions or . . . some opportunities to arrest [him]."

At the close of the government's cross-examination, the IJ questioned Tun at length. The IJ first asked Tun why the Burmese government would give him a passport and other documents necessary to exit the country if it wanted to persecute him. Tun responded that the government was "very happy" to "get rid of" pro-democracy advocates like himself who opposed the current regime. Besides, Tun testified, there were always corrupt government officials who could be bribed to assist persons like Tun in leaving the country. When the IJ asked Tun why the government would not want him to obtain asylum in the United States if it was "happy to get rid of people like [him]," Tun responded that while it was true

the government wanted to get rid of people like him, it also was "happy to see . . . that we are in trouble."

With respect to Tun's claims that his parents were politically active, the IJ asked Tun how they could be "township leaders," as Tun had stated in his asylum application, if they participated in promoting democracy and opposed the military government. Tun responded that they were not part of the official township government, but were leaders of the NLD in Yamethin township. The IJ also asked Tun why he was persecuted merely for passing out leaflets if his parents were permitted to hold monthly NLD meetings without punishment. Tun stated that he was arrested because he passed out the leaflets in a crowded area, which was not permissible at that time, and that the government did not interfere with his parents' NLD meetings as long as the meetings were peaceful and there were no demonstrators on the streets.

When asked about his uncles, Tun told the IJ that both were arrested in 1996 and released in 1999. The IJ asked Tun to explain why his asylum application stated not once, but twice, that his uncles were still in prison as of 2003. Tun stated that it must have been a translation error and that he did not have the original Burmese translation of his asylum application. The IJ then questioned Tun again regarding his earlier testimony that he was precluded for political

reasons from continuing his education at the university:

IJ: Okay, sir. When you – Well, let me ask you. Did you graduate from the government technical institute in 1996?

Tun: . . . . Yes, sir. I got my diploma certificate.

IJ: And you completed all of the classes that were required for that certificate?

Tun: Yes, sir.

IJ: Well, if you got that graduation certificate, why is it that you didn't go to the university if you had your diploma certificate?

Tun: Because they would not allow me to continue my education.

IJ: Well, did you need this diploma certificate to get into the next level at the university?

Tun: Yes, sir.

IJ: Well, if you had the diploma, then why didn't you make the application to go to the university?

Tun: I did apply, sir, but I was denied.

IJ: And do you have a letter showing that you were denied?

Tun: No sir, I was informed verbally.

IJ: . . . . Well, this is inconsistent with what you testified to before, sir. You testified before that 'The institute did not give me a certificate needed to go to the university.' You went on to say, 'I didn't pass everything. I got a three-year diploma, but not a degree.'

Tun: Yes, sir. I did mention that I did not get any degree. But according to our, the education system of our country, the terminology that we use there . . . is different.

IJ: Well, if you needed the certificate, . . . and you got the certificate, I can't understand why that certificate wasn't accepted.

Tun: Let me . . . explain, please. Because in our school, after we finish our high school, we have to have, go to this technical institute to get our certificate.

IJ: Yes. And you did get that certificate I understand.

Tun: Yes, sir. I finished my three years course at that institute and I got very high grade and in fact I was qualified to join another university, but they did not accept my application.

13

IJ:    Well, why did you testify before that you didn't pass all the courses? What courses did you have to pass that you didn't pass?

Tun:  Because I did not say so. At that time, I said that I finished all the classes at the time.

Tun indicated that he could not obtain documentation to prove that he applied for admission to the university in July 1996 because the school refused to release his records, and that he first learned that he would not be able to get his degree after he was released from his seven-month detention. When the IJ pointed out that Tun had stated previously that he had applied for and was denied admission to the university after he finished his apprenticeship, Tun clarified that while he did learn at that time that he had been denied admission, he did not know "the real reason" for the university's decision. It was only upon being released from prison, when an officer told him that he had been denied admission because of his past activities, that he discovered he had been barred from continuing his education for political reasons.

With respect to his allegations of torture, Tun told the IJ that a soldier with some medical training sutured the wounds on his knees and he did not go to a doctor after being released because by that time his wounds had healed. Tun further testified that he suffered some hearing loss as a result of being struck so many times on the side of his head, but could not afford medical treatment either

14

in Burma or the United States. The IJ asked Tun how he could afford to travel to New York for protests and donate money to pro-democracy groups, but could not afford to see a doctor. Tun indicated that his hearing problem "was nothing serious" and that he donated money to the pro-democracy organizations in Burma because it was the right thing to do.

Finally, the IJ questioned Tun about the date of the founding of the NLD. When Tun stated that it was 25 September, the IJ pointed out that Tun had testified on direct examination that the anniversary was on the 24 September, and had attached to the record a press release stating that the anniversary date was 27 September. Tun was unable to explain why the press release would have been mistaken about the date.

The IJ denied Tun's application for asylum, withholding of removal, and CAT relief, finding that Tun's testimony was "not sufficiently detailed, consistent, or believable to provide a plausible and coherent account of the basis for his fears" and thus was insufficient to establish his eligibility for asylum, withholding of removal, or CAT relief. The IJ further found that Tun failed to introduce adequate corroborating evidence or documentation and that such evidence could and should have been provided by Tun.

On appeal from the IJ's denial of his application to the BIA, Tun argued that

the IJ: (1) violated his due process rights by abandoning his role as a neutral and impartial arbiter; (2) improperly demanded documentary evidence that did not exist or was impossible to produce; (3) improperly suggested that Tun could return home and abandon political activity; and (4) should have recused himself for bias and prejudice against Tun. He concluded that, based on these errors, the IJ wrongly denied his application for asylum, withholding of removal, and CAT relief.

Dismissing Tun's appeal, the BIA found first that the IJ had not demanded that Tun cease political activity, but rather, merely suggested that the government had no particular interest in Tun, as evidenced by the fact that Tun had lived peacefully for several months without incident after being released from prison and signing an agreement not to participate in politics. The BIA next found that the IJ did not usurp the role of the prosecutor when cross-examining Tun, but was simply trying to understand Tun's testimony and build the record. Because the IJ's questioning, though lengthy, did not exceed the scope of the direct examination and did not reflect any hostility or bias, the BIA concluded, Tun had failed to establish a due process violation.

The BIA further found that the IJ did not mischaracterize Tun's responses in order to support an adverse credibility determination and that the IJ's adverse

credibility determination was supported by "myriad inconsistencies" in the record. Moreover, given the weakness of Tun's testimony, the IJ did not err in finding that corroborative evidence should have been provided. The BIA concluded that because the IJ's adverse credibility determination was not clearly erroneous, Tun failed to meet his burden of proof for establishing eligibility for asylum, withholding of removal, and/or CAT relief.

## II. DISCUSSION

On appeal, Tun argues that the IJ's adverse credibility finding was improper, that the IJ erred in demanding that he provide corroborating evidence, that the IJ violated his due process rights by cross-examining him and abandoning his role as a neutral arbiter, and that the BIA erred in affirming the IJ's denial of his petition for CAT relief because it was more likely than not he would be tortured upon returning to Burma. We address each argument in turn.

"We review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). To the extent that the BIA does adopt the IJ's reasoning, we review the IJ's decision as well. See id. Because in this case the BIA did not expressly adopt the IJ's decision, we review only the BIA's decision.

We review the BIA's legal conclusions de novo and its factual findings

17

under the substantial evidence test, which requires us to affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007) (quotation marks and citation omitted). Under this highly deferential standard, we view the record in the light most favorable to the BIA's decision and are bound by that decision "unless [a] reasonable adjudicator would be compelled to conclude to the contrary." Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc) (citing 8 U.S.C. § 1252(b)(4)(B)). Accordingly, "even if the evidence could support multiple conclusions, we must affirm the agency's decision unless there is no reasonable basis for that decision." Id. at 1029.

A. Adverse Credibility Determination

As an initial matter, we note that although neither party raises the issue of whether Tun exhausted administrative remedies with regard to the IJ's adverse credibility determination, we are obligated to review our jurisdiction sua sponte. See United States v. City of Miami, Fla., 664 F.2d 435, 444-45 (11th Cir. 1981) (en banc) (Rubin, J., concurring). We may review a final order of removal only if "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1); see also Fernandez-Bernal v. U.S. Att'y Gen., 257

18

F.3d 1304, 1317 n.13 (11th Cir. 2001). Where the IJ makes an explicit adverse credibility determination and the petitioner does not specifically challenge this finding on appeal to the BIA, the petitioner has failed to exhaust his administrative remedies, thereby depriving of us jurisdiction to consider the IJ's credibility determination on petition for review. See Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) (per curiam). This remains true even if the BIA has considered the issue sua sponte. Id. at 1251.

Although Tun did not raise an explicit challenge to the IJ's adverse credibility determination under an enumerated heading in his brief on appeal to the BIA, he argued, in the context of his argument that the IJ was biased, that the IJ misconstrued his testimony in order to find inconsistencies in the record and disputed the IJ's findings concerning specific areas of testimony on which the IJ based his credibility finding. Because Tun's brief adequately notified the BIA that he wished to challenge the adverse credibility determination, we deem the issue exhausted before the BIA and address the merits. See, e.g., Lin v. U.S. Att'y Gen., 543 F.3d 114, 121 (3d Cir. 2001) (noting that the exhaustion requirement should not be applied in a "draconian fashion" and holding that, "so long as an immigration petitioner makes some effort, however insufficient, to place the [BIA] on notice of a straightforward issue being raised on appeal, a petitioner is deemed

19

to have exhausted [his] administrative remedies") (quotation marks and citation omitted).

To establish eligibility for asylum, the applicant bears the burden of proving, with credible evidence, that he was (1) persecuted in the past on account of race, religion, nationality, membership in a particular social group, or political opinion; or (2) has a well-founded fear of future persecution on account of a statutorily-protected ground. See 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(a), (b); see also Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006) (per curiam).[5]

An applicant's testimony may be sufficient, without corroboration, to sustain this burden, so long as the trier of fact is satisfied that the applicant's testimony is credible. See INA § 208(b)(1)(B)(ii), 8 U.S.C. § 1158(b)(1)(B)(ii); 8 C.F.R. § 208.13(a); see also Niftaliev v. U.S. Att'y Gen., 504 F.3d 1211, 1217 (11th Cir. 2007) (quoting In re S-M-J, 21 I. & N. Dec. 722 (BIA 1997)) (noting that "an alien's own testimony can suffice where the testimony is believable,

---

[5] To establish eligibility for withholding of removal under the INA, an applicant must demonstrate that it is "more likely than not" that she will be persecuted upon returning to her home country on account of a protected ground. Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002) (per curiam) (quotation marks and citation omitted). Because "[t]his standard is more stringent than the well-founded fear of future persecution required for asylum," Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006) (quotation marks and citation omitted), an applicant who fails to establish eligibility for asylum is generally precluded from qualifying for withholding of removal, see Al Najjar, 257 F.3d at 1292-93.

20

consistent, *and* sufficiently detailed"). On the other hand, an adverse credibility determination alone may be sufficient to support the denial of relief, especially where the applicant produces no evidence other than his own testimony. See Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1345 (11th Cir. 2008). Though corroborative evidence is not required, "[t]he weaker an applicant's testimony, . . . the greater the need for corroborative evidence." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (citation omitted).

"Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005) (quotation marks and citation omitted). The BIA's credibility determination, like any other finding of fact, is reviewed for substantial evidence and may not be overturned unless the record compels it. Id.

Tun argues that the adverse credibility finding was erroneous because he was not given an opportunity to explain the inconsistencies cited by the IJ, his explanations were ignored, and the IJ made unfounded assumptions. He contends additionally that the BIA misinterpreted Matter of S-M-J- in finding that the IJ did not err in demanding that Tun provide proof that he was arrested, detained, and

21

tortured, because the records either did not exist or could not be obtained. Finally, he contends that the BIA and IJ erred in denying his petition for asylum and withholding of removal for the above-mentioned reasons.

In finding that Tun was not credible when he claimed to have been persecuted and tortured in Burma on account of his political opinion, the BIA specifically noted the following: (1) Tun testified initially that he did not go to the university because the technical institute refused to issue him the necessary certificate, but later testified that he was rejected by the university because of his political opinion; (2) Tun testified that he applied to the university, but his asylum application states that he graduated from the university; (3) Tun testified that he learned from the university that his admission was denied, but later testified that he first learned that he would be unable to attend the university from a prison officer upon being released from his seven-month detention; (3) Tun's assertion that the government wanted to persecute him merely for distributing pro-democracy leaflets was incompatible with his testimony that his parents were permitted to openly participate in anti-government political activities without repercussion; (4) Tun stated in his asylum application that his two uncles were still in jail in 2003, but testified at the removal hearing that they were released from detention in 1999 or 2000; (5) Tun's asylum application contained no details about

22

his 1996 detention and torture, yet he gave "vivid testimony" with regard to these events at the removal hearing; (6) Tun testified that he was brutally tortured, yet he did not seek any medical treatment after the alleged torture.

We note initially that although the BIA's decision affirming the IJ's adverse credibility determination was ultimately supported by substantial evidence, we do not believe that the record supports the BIA's conclusion that Tun was inconsistent with regard to whether or not he graduated from the university. Tun testified at the removal hearing that he graduated from the government technical institute (also referred to as Mekthilar Technical Institute) in 1996 and subsequently applied to continue his degree at the university but was not accepted due to his past political activity. This testimony is consistent with Tun's asylum application, which states that he graduated from "pre-university" at the government technical institute in Meiktila in 1996, but was barred from attending Yangon Institute of Technology for his "higher education." It is clear from our reading of the record that the Mekthilar Technical Institute is separate and distinct from the "university," which is elsewhere referred to as Rangoon/Yangon Institute of Technology and/or Rangoon University. Contrary to the BIA's assertion, Tun does not allege in his asylum application that he ever gained admission to, attended, or graduated from "Rangoon Institute of Technology," "Rangoon

23

University," or any other "university."  Though the BIA misreads the record in this regard, we nevertheless conclude that the other inconsistencies cited by the BIA are supported by ample evidence in the record and provide sufficient grounds for the adverse credibility determination.

Further, in light of the weaknesses and lack of clarity in Tun's testimony, we agree with the BIA that it was not incorrect for the IJ to find that corroborating evidence could and should have been presented.  See Yang, 418 F.3d at 1201.  We further agree that the IJ did not misinterpret Matter of S-M-J.  In that case, the BIA simply held that IJs may not place "[u]nreasonable demands . . . on an asylum applicant to present . . . corroboration from the persecutor."  21 I. & N. Dec. at 725.  Accordingly, corroborating documentary evidence of the asylum applicant's particular experience is not required where the applicant's claim "relies primarily on personal experiences not reasonably subject to verification."  Id.  An asylum applicant should, however, "provide documentary support for material facts which are central to his or her claim and easily subject to verification, such as evidence of his or her place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment."  Id.  Where an applicant does not provide such evidence, he should adequately explain his failure to do so.  Id.

Even assuming the credibility of Tun's claim that his persecutors would not give him documents corroborating his seven-month detention and torture, and that a demand for such information would be unreasonable under Matter of S-M-J-, Tun nevertheless failed to provide any plausible explanation for his inability to produce corroborative evidence of other material aspects of his claims, including, for example, evidence that he had been arrested, that his parents were members of the NLD, that he was denied admission to the university because of his political opinion, or that his parents lost their jobs because of their political activities. With respect to Tun's failure to provide evidence of his parents' political activities, we note that Tun's claim that his parents would face criminal sanctions for sending proof of their NLD membership through the mail is seriously undermined by his testimony that the government was aware of his parents' involvement with the NLD and in fact permitted them to organize and convene NLD meetings. Accordingly, the BIA correctly held that it was not unreasonable for the IJ to consider the absence of such corroborating evidence in concluding that Tun had failed to meet his burden of proof. See id. at 725-26.

In sum, given the inconsistencies in the record and the lack of documentary evidence corroborating Tun's allegations of persecution, we cannot say that the record compels reversal of the BIA's conclusion that Tun was not credible and

25

thus failed to demonstrate that he suffered past persecution or had a well-founded fear of future persecution on account of a protected status. See Mohammed, 547 F.3d at 1352 (stating that where there is no evidence other than an applicant's testimony, an adverse credibility determination alone is sufficient to deny the application). Inasmuch as Tun failed to carry his burden of proving eligibility for asylum, he cannot satisfy the more stringent standard applicable to a claim for withholding of removal. See Forgue, 401 F.3d at 1288 n.4 (noting that applicant who fails to establish claim of asylum on the merits necessarily fails to establish eligibility for withholding of removal or CAT relief).

B. Due Process

Tun next argues that the IJ's cross-examination violated his due process right to a fair hearing because the IJ "focused his questions on minutia that did not go to the heart of the asylum claim" and "asked his questions solely for the purpose of finding any minuscule discrepancy" in order to deny relief. Appellant's Brief at 11. He asserts that the BIA abandoned its duty to review the record objectively and never considered whether the IJ improperly based its decision on nonmaterial testimony and erroneous assumptions.

We review constitutional due process claims de novo. See Lonyem v. United States Att'y Gen., 352 F.3d 1338, 1341 (11th Cir. 2003) (per curiam). It is

well-settled that an individual in removal proceedings is entitled to due process of law under the Fifth Amendment. Reno v. Flores, 507 U.S. 292, 306, 113 S. Ct. 1439, 1449 (1993); see also Fernandez-Bernal, 257 F.3d at 1311. "Due process is satisfied only by a full and fair hearing." Ibrahim v. INS, 821 F.2d 1547, 1550 (11th Cir. 1987) (citation omitted). In order to establish a due process violation, however, aliens must demonstrate both a deprivation of liberty without due process of law and substantial prejudice. See Lonyem, 352 F.3d at 1341-42. With respect to the latter, the alien must demonstrate that the outcome of the removal proceedings would have been different but for the alleged constitutional errors. Ibrahim, 821 F.2d at 1550.

While we have not defined when an IJ has acted in a manner that deprives an alien of his due process rights, the Seventh Circuit has held that the IJ does not violate the applicant's due process rights by "limit[ing] the extent of some testimony or frequently interrupt[ing] the applicant's presentation," because such conduct merely "serve[s] to focus the proceedings and exclude irrelevant evidence." Kerciku v. I.N.S., 314 F.3d 913, 917-18 (7th Cir. 2003) (per curiam); see also Torres v. Mukasey, 551 F.3d 616, 627 (7th Cir. 2008) (IJ's overactive role during the hearings, impatience, improper questioning, and "reliance on personal knowledge beyond the facts in the record" was not so egregious as to violate

27

applicant's due process rights); Hassan v. Gonzales, 403 F.3d 429, 436-37 (6th Cir. 2005) (IJ's statements that petitioner was "completely unbelievable" and that his testimony was "inherently incredible," "internally inconsistent," and "nonsensical," while "brusque" and inartful, did "not reveal an underlying bias in favor of the Government" and thus petitioner "was given a full and fair opportunity to present his case for relief in front of a neutral arbiter" and was not denied due process" especially given that petitioner's testimony "was contradictory and inconsistent").

The Seventh Circuit held that the IJ does, however, violate an applicant's right to due process where he "bar[s] complete chunks of oral testimony that would support the applicant's claims." Kerciku, 314 F.3d at 918. The Ninth Circuit similarly has held that an applicant is denied a full and fair hearing in violation of the Fifth Amendment where the IJ "behave[s] not as a neutral fact-finder interested in hearing the petitioner's evidence, but as a partisan adjudicator seeking to intimidate [petitioner] and his counsel" and "refuse[s] to let [petitioner] testify about anything that was included in his written application." Colmenar v. INS, 210 F.3d 967, 971 (9th Cir. 2000).

We agree with the BIA that the IJ's conduct during the removal hearing did not violate Tun's due process rights. Although the IJ did question Tun at length

28

and pointed out key weaknesses in Tun's claims – noting, for example, the lack of persecution faced by Tun's parents for their activities, Tun's ability to live freely for some ten months after his release, and Tun's failure to apply for asylum in any of the other countries through which he passed in the four years he spent as a sailor – it is clear from our reading of the record that the IJ's questions and comments, which were related to the material facts underlying Tun's claims, were meant to understand and clarify Tun's testimony and to elicit evidence necessary to develop the record.  At no point during his questioning of Tun did the IJ impugn Tun's character or otherwise indicate that he believed Tun's claims to be without merit, nor did the IJ ever refuse to let Tun testify about events that would support his claim for relief.  Because Tun was given a full and fair hearing, he has failed to establish that his due process rights were violated.

C. CAT Relief

Tun does not argue the merits of his CAT claim in his brief to the BIA, contending instead that the IJ erroneously denied CAT relief "as a result of the Court's abandonment of its role as a neutral and impartial arbiter, unfair demands and disregard for [the] holdings in Matter of S-M-J- . . . as well as bias and prejudice against respondent."  AR at 26.  Tun's passing reference to his CAT claim is insufficient to constitute actual presentation of the claim to the BIA for

purposes of exhaustion. Cf. Alim v. Gonzales, 446 F.3d 1239, 1254-55 (11th Cir. 2006) (petitioner exhausted remedies with respect to CAT claim where his brief "expressly stated that the issues decided by the IJ 'concerned his applications for . . . protection under the Convention Against Torture,'" "recount[ed] the IJ's factual findings, and legal conclusions, on the merits of [his CAT claim]" and "formally request[ed] that the BIA withhold removal under the . . . CAT, with specific references to the applicable federal statutes and regulations"). We therefore lack jurisdiction to consider whether Tun successfully established eligibility for protection under the CAT. See Amaya-Artunduaga, 463 F.3d at 1250. Even if jurisdiction were not lacking, however, we note that Tun's CAT claim nevertheless would fail because it is based on testimony the IJ found not credible and he offers no other evidence demonstrating that it is more likely than not he would be tortured if returned to Burma.

### III. CONCLUSION

Because substantial evidence supports the BIA's determination that Tun was not credible, and nothing in the record would compel a reasonable fact finder to conclude otherwise, we **DENY** Tun's petition for review of the BIA's decision dismissing his appeal from the IJ's denial of asylum and withholding of removal.

**PETITION DENIED**.